**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| In re COINMINT, LLC. | ) | C.A. No. 2019-0983-MTZ |

## OPINION

Date Submitted:  April 15, 2021
Date Decided:  May 10, 2021
Date Issued:  August 12, 2021

Evan O. Williford, THE WILLIFORD FIRM LLC, Wilmington, Delaware, *Attorney for Petitioner Mintvest Capital Ltd.*

Kenneth J. Nachbar and Elizabeth A. Mullin, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Respondent Coinmint Living Trust.*

**ZURN, Vice Chancellor.**

This case presents an oft-repeated fact pattern with a legal wrinkle. Two friends together developed a successful enterprise: from the outset, they agreed that they would be equal partners, with one providing labor and know-how, and the other providing funds. The sweat equity partner acknowledged his interest in the company would likely be diluted as the financial partner contributed capital. They memorialized this understanding in the limited liability company's operating agreement, which outlined procedures to effectuate dilution via capital contribution, among other things. Each partner held his respective membership interest through an investment vehicle and each was represented on the company's board of managers. The company flourished, but the friendship fractured, and litigation followed.

In this iteration of this fact pattern, the enterprise is a bitcoin mining firm. In 2016, the company dove into the fast-paced business of bitcoin mining. The sweat equity partner requested rapid and frequent cash infusions from the financial member, who provided those funds upon request. They conducted the company's business informally, disregarding the operating agreement's formalities. As a result, the financial member's cash infusions did not follow the operating agreement's strictures for dilutive capital contributions, but the sweat equity member never objected. Instead, in 2017, the sweat equity member agreed it had been diluted below five percent, and negotiated to have its equity increased and fixed at roughly

1

eighteen percent. To preserve that percentage, the financial member agreed that its future cash infusions would be categorized as nondilutive loans. The parties proceeded with the mutual understanding that the financial member controlled over eighty percent of the company.

As the company grew, the friends strategized to redomesticate the company in Puerto Rico. They converted the company to a Puerto Rican limited liability company in 2018. Consistent with the members' history of ignoring the operating agreement's formalities, they did not conduct a formal vote or solicit written consents to effectuate that conversion. Nonetheless, the sweat equity partner championed this plan, and he affirmed his consent to it as recently as 2019.

The friends' relationship thereafter unraveled, and the financial member leveraged its majority interest to unilaterally amend the operating agreement and remove the sweat equity partner from his managerial role. The sweat equity member now challenges its dilution, the conversion, and the partner's removal from management, and requests an order dissolving the company. This post-trial opinion concludes that the sweat equity member waived the operating agreement's formalities for dilution and conversion; acquiesced in that dilution and the company's conversion; and is estopped from asserting that he controls half of the company's equity and from challenging the conversion.

Because of the conversion and the company's 2018 redomestication in Puerto Rico, the sweat equity member's challenge to the partner's removal and request for dissolution present an issue of first impression: whether the Court of Chancery has subject matter jurisdiction to dissolve or to declare the proper managers of a foreign entity. This opinion concludes that (1) the company's conversion to a Puerto Rican entity stripped this Court of statutory jurisdiction to declare the company's present managers and to order judicial dissolution under the Delaware Limited Liability Company Act, as those statutory grants are cabined to domestic entities; and (2) this Court is without subject matter jurisdiction to work an equitable dissolution of a Puerto Rican entity.

Accordingly, judgment is entered in favor of the financial member as to the company's conversion, and the sweat equity member's requests to declare the Puerto Rican entity's proper managers and order dissolution are dismissed.

## I. BACKGROUND[1]

Having weighed the evidence and evaluated the credibility of the witnesses, I find that the following facts were proven by the preponderance of the evidence presented at trial.

---

[1] Citations in the form of "Am. Compl. —" refer to the Amended Complaint, available at Docket Item ("D.I.") 16. Citations in the form of "PTO —" refer to the Joint Pre-Trial Stipulation and Order, available at D.I. 207. Citations in the form of "Last Name Tr. —" refer to the trial testimony of the identified witness, available at D.I. 235 and D.I. 236. Citations in the form of "JX —" refer to joint exhibits in the trial record. And citations in

3

Nominal Respondent Coinmint, LLC ("Coinmint" or the "Company") is a private bitcoin mining firm that operates one of the largest digital currency centers in the world.[2] It was founded by two childhood friends, nonparties Prieur Leary and Ashton Soniat.[3] Leary and Soniat formed Coinmint as a Delaware limited liability company in August 2016.[4] Leary and Soniat hold their interests in Coinmint via their respective entities: Petitioner Mintvest Capital Ltd. ("Mintvest") and Respondent Coinmint Living Trust ("CLT").[5] Leary is president of Mintvest, a Delaware corporation.[6] Soniat is the owner and controller of CLT, a Puerto Rican entity.[7] Mintvest and CLT are and always have been Coinmint's only Members,[8] and at all relevant times, those entities acted by and through their human decisionmakers, Soniat and Leary.

At the time of formation, the parties agreed Leary would run Coinmint's day-to-day operations, contributing labor and know-how, while Soniat would fund those

the form of "Op. Agr. —" refer to Coinmint's Limited Liability Company Agreement dated November 21, 2016, available at JX 11.

[2] *See* Leary Tr. 10; JX 60 at COINMINT_157338, -157357.

[3] PTO ¶ 12.

[4] *Id.* ¶¶ 9, 13.

[5] *Id.* ¶ 16.

[6] *Id.* ¶¶ 7, 10.

[7] *Id.* ¶¶ 8, 11.

[8] *Id.* ¶ 9.

operations.[9]  Leary and Soniat agreed that Mintvest and CLT would be Coinmint's 50% owners,[10] that the friends would "work together agreeing on all material decisions and expenditures," and that Soniat would eventually contribute more capital and Leary would be diluted.[11]  For example, Leary stated to Soniat,

> At some point, given your financial resources are great[er] than mine, it is contemplated you will contribute more.  It is agreed that I accept equity dilution as this happens, in a manner that is directly related to the capital put in.  Long story short, it is my hope that this is a big success and I am a minority interest holder here.[12]

Mintvest and CLT memorialized their 50-50 equity split and dilution mechanisms in Coinmint's Limited Liability Company Agreement dated November 21, 2016 (the "Operating Agreement").[13]

As agreed, Leary operated Coinmint and Soniat bankrolled those operations via CLT.  The parties now dispute how certain of CLT's cash infusions should be

---

[9] *Id.* ¶ 20; JX 4.

[10] PTO ¶ 16; JX 4 at COINMINT071041; JX 7 at COINMINT_157136.

[11] JX 4 at COINMINT071042.

[12] *Id.*; *see also* Leary Tr. 77; JX 5 at COINMINT065914 ("We are equal as long as our contributions are equal.  If one contributes more, then the other will have the option to match it.  If no match, then dilution will occur.  My suggestion is to have meetings at least quarterly (or more often by request) to effect dilution, meet strategically on company direction, and decide distributions."); JX 7 at COINMINT_157137 ("Mintvest will be matching the contribution that Ashton made, to the extent that it can.  After that point, it will face dilution, pursuant to the agreement.").

[13] *See* Op. Agr.; PTO ¶ 14; *see also* JX 7 at COINMINT_157137 ("Mintvest will be matching the contribution that Ashton made, to the extent that it can.  After that point, it will face dilution *pursuant to the agreement*." (emphasis added)).

classified (*i.e.*, whether they are capital contributions or loans under the Operating Agreement) and whether those cash infusions diluted Mintvest's stake in the Company.[14] Leary maintains that Mintvest was never diluted, but instead maintained its 50% equity interest notwithstanding CLT's nearly continuous funding.[15] CLT contends that Mintvest was significantly diluted to the point that its interest in the Company was under 5%, but then Leary and Soniat renegotiated and increased Mintvest's stake to 18.2%. The facts presented at trial support CLT's position.

### A. The Parties Memorialize Their Understanding In The Operating Agreement, But Eschew Its Formalities.

Under the Operating Agreement, Coinmint is manager-managed with a Board of Managers (the "Board"), and all Company actions and decisions flow through the Board.[16] While Members retain the right to vote on certain major decisions, like effectuating a merger,[17] they have no "authority or power to act for or on behalf of the Company."[18] Section 4.3(f) of the Operating Agreement states that "any Board action shall require the approval of a Majority of the Managers then serving on the

---

[14] PTO ¶ 27.

[15] *See* Am. Compl. ¶¶ 102, 111, 123.

[16] *See* PTO ¶ 15; Op. Agr. §§ 3.9, 4.3.

[17] *See* Op. Agr. § 4.6.

[18] *Id.* § 3.9.

Board."[19]  Sections 4.3 through 4.6 of the Operating Agreement describe (1) how the Managers may take action on the Company's behalf, including at a formal meeting or by written consent, and (2) what vote is required to take such action, including when majority Board approval and majority Member approval are needed.[20]

Under Section 4.1(b), Mintvest appointed Leary to serve as a Manager and its Board designee; CLT appointed itself to serve as a Manager and Board designee.[21] Under Section 4.2(a), those Managers could be removed "with or without cause, only by the Member who designated such Manager to serve on the Board."[22]

Each Manager's voting power is determined by its appointing Member's respective equity stake:[23]

> Each Manager shall have the voting power equivalent to the Sharing Ratio of the Member that appointed such Manager and, unless otherwise expressly stated in this Agreement, all actions by or requiring the consent or approval of the Board shall require the consent or approval of a Majority of the Board.[24]

---

[19] *Id.* § 4.3(f).

[20] *See id.* §§ 4.3, 4.4, 4.5, 4.6.

[21] *Id.* § 4.1(b); PTO ¶¶ 17, 18.

[22] Op. Agr. § 4.2(a).

[23] *See id.* §§ 3.6, 3.7, 10.5 & Sched. 1.

[24] *Id.* § 4.3(e).

The Member's Sharing Ratio, or equity interest, and its correlating voting power may be increased or diluted via cash infusion.[25] The Operating Agreement contemplates that cash infusions may take the form of either a loan or capital contribution.[26] Cash infusions in the form of loans are not contributions; they cannot increase a Member's equity stake, and do not have dilutive effect.[27] Capital contributions affect voting power of the Members and their appointed Managers.[28]

The Operating Agreement prescribes certain formalities to effectuate a capital contribution and adjustment; the parties do not meaningfully dispute those formalities. Section 3.2(a) of the Operating Agreement contemplates that if there are "insufficient Available Funds to cover operating deficits or other capital needs of the Company, the Board shall notify the Members in writing of such deficits and other cash needs," after which each Member is required to make an additional capital contribution to the Company.[29] In other words, the Board must determine that a capital call is required, vote to make the capital call, and approve written notice to

---

[25] *See id.* § 3.6. The "Sharing Ratio" refers to Mintvest and CLT's respective ownership percentages, as reflected in each Member's Capital Account, in accordance with Section 3.7 of the Operating Agreement, which "may change from time to time as provided in th[e] [Operating] Agreement." *Id.* § 1(rrr); *see also id.* § 3.6 & Sched. I. The Sharing Ratio is subject to Section 3.2, which governs dilution. *See id.* §§ 3.2, 3.6, 3.7.

[26] *See id.* §§ 3.2, 3.5, 3.6.

[27] *See id.* §§ 3.5, 3.6(f).

[28] *See id.* §§ 3.2, 3.6, 4.3(e).

[29] *See id.* § 3.2(a).

the Members.[30]  The Board must do so in compliance with the Operating Agreement's procedural requirements.[31]  Thereafter, the Board must send advance written notice of the call to the Members.[32]

Each Member has the right to match its counterpart's capital contributions to avoid dilutive effect.  If a Member fails to make a required capital contribution, the other Member may make that contribution, and the parties' respective equity percentages will be immediately adjusted to reflect the disparate contributions.[33]  Such adjustments shall be "effective as of the date the amount requested under [Section 3.2(a)] was due," and "shall be made by the Board in good faith."[34]  The Board should provide notice of any adjustment to the diluted Member, but failure to do so does not nullify the dilution.[35]

The parties did not follow the Operating Agreement's formalities, and instead mutually pursued a fast-and-loose course of operations and documentation.[36]  As

---

[30] *See id.*

[31] *See id.* § 4.4 (stating that Board action must be taken at a meeting or by written consent).

[32] *See id.* § 3.2(a).

[33] *See id.* § 3.2(a)(1)–(2) (discussing the consequences of a Member's failure to make any required additional capital contribution, namely a "Failed Contribution").

[34] *Id.* § 3.2(a)(2).

[35] *See id.*

[36] *See, e.g.*, JX 28 at 1 (stating with respect to Mintvest's dilution that "[Leary] [did not] think we would actually need any further paperwork on this," as he was "not aware of either Ashton or [him]self wanting to change what it is now," and that this was "[j]ust [Leary's] 2 cents for minimizing documentation, and as we are working on the big enchilada now, there is a very likely chance that within 30 days, we will need to make

9

Leary explained, "our meetings were . . . like this[:] Ashton and I would get together

and agree on certain things and then do them."[37] Soniat corroborated this statement:

changes again," and questioning "[w]hy paper something now that has been as it is for months, and then do it again shortly?"); JX 79 at MINTVEST00001945 (stating that Leary thought "it would have been much easier to have one doc that says the monies sent in from Dorado would be treated as a loan, unless there was an agreement to the contrary" because that "[w]ould avoid all of this paperwork," with Soniat responding that he believed "we need a clean history of loans"); Leary Tr. 110 (conceding that the Company did not adhere to formalities); *id.* 120 ("She asked me to sign loan documents. She asked me to sign all kinds of documents. And usually it wasn't frequent, which is why I answered the other question like I did. It was more infrequent. Like, a few times a year I was given a pile of papers or a pile of documents to sign, and just instructed to sign these, don't worry about them. And, again, Ashton was my friend. I just trusted Kathleen was doing everything right."); Soniat Tr. 236–37 (referring to Leary's comments regarding minimizing paperwork in JX 28, and stating: "I would say that summarizes the way Leary liked to do business. He did not like to document things, he did not like to sign things, and liked to do it very, very casually. And when, whether it was Kathleen or Mr. Carlton tried to, you know, have him sit down, have a meeting, get things documented, it was always pushed back, and that he's too busy running around the world, working. He's working 16 hours a day. He doesn't have time for this, to sign these things or go over these housekeeping issues. So that's a pretty good summary of the way the business was run."); Carlton Tr. 335 ("Mr. Soniat was being more of a passive investor, I would say, who was simply funding things. Mr. Soniat wanted things done right, but was largely deferring to Mr. Leary to kind of set the priorities for me and others. Contrary to kind of how I would normally like to do things, Mr. Leary hated formalities, and it was almost impossible to get focused on administrative matters. He'd schedule calls with us and other attorneys and not show up. Overall, he was extremely resistant to prioritizing internal items and structural items. Whether it was him being overwhelmed or something more nefarious, it was almost impossible to get him to sign or respond to things on those fronts. He'd actively push us to demote, avoid, delay, or not prioritize such items. Mr. Soniat was a little easier to get in touch with, but was also hard to chase down at times."); *id.* 336 ("We seemed like we were always trying to catch up and trying to document things after the fact simply because we weren't getting the information ahead of time. And given the personalities involved, trying to document things even after the fact proved very difficult."); Schneider Tr. 406 (stating that Leary's unwillingness to formally document Company actions was "typical").

[37] Leary Tr. 110.

I think it's pretty clear how things were run. It was run casually. And we had to act very quickly, as displayed in the WhatsApp messages, where he was on the ground, either in China or Upstate New York, and would tell me that, you know, "we need money fast. Sorry for the last notice, but, you know, I can buy $500,000, a million dollars' worth of machines, but if we don't wire the money tomorrow they may not be there."

And so it was a very fluid process, quick, where we had to act. And, as I said, we were on the phone hours and hours per day. So I mean, if he ever wanted to have an official meeting, I would probably find that bizarre, but I would have agreed, for sure.[38]

Leary never complained about Coinmint's internal lack of formal process, and instead advocated for eschewing formalities and praised the outcomes.[39] It is undisputed that the Company has had no formal Board meetings where minutes were created.[40] And except for written consents executed in November and December 2019 (the validity of which Mintvest disputes), the Board never executed a written consent in lieu of a meeting to authorize Company action.[41]

---

[38] Soniat Tr. 276.

[39] *See, e.g.*, *id.* 276–77.

[40] PTO ¶ 28.

[41] *Id.* ¶ 29.

### B. CLT Dilutes Mintvest; Leary Negotiates To Increase Mintvest's Diluted Position To 18.2 Percent.

As contemplated at formation, Leary requested from Soniat, and Soniat provided, funds to support the Company's operations;[42] neither Mintvest nor Leary provided funds aside from an initial contribution.[43] Some of the funds Soniat provided on CLT's behalf were loans, and others were treated as capital contributions.[44]

By the end of 2016, Soniat's capital contributions diluted Mintvest's interest to 5.5%.[45] By early 2017, it was reduced even further.[46] But consistent with the Company's internal practice of disavowing formal procedures, Coinmint does not have any Board minutes reflecting a capital call vote; any written consent authorizing a capital call; or any capital call notice sent to Members.[47] Leary never objected on Mintvest's behalf to characterizing Soniat's cash infusions as CLT capital contributions—until he filed this suit.[48]

---

[42] *See, e.g.*, *id.* ¶ 26; JX 1 at 1386, 1390, 1397, 1398, 1420, 1425, 1426, 1437, 1465, 1473, 1504, 1534, 1542; Leary Tr. 95–97, 107–08; Soniat Tr. 211–12, 217, 290.

[43] *See* Leary Tr. 77; Soniat Tr. 211–12.

[44] *See* Soniat Tr. 293, Leary Tr. 47.

[45] *See* JX 15 at COINMINT_157205; JX 64A at COINMINT_157468.

[46] *See* JX 124 at 2.

[47] *See* PTO ¶¶ 28–29.

[48] *See* Soniat Tr. 215, 230, 241, 275–78, 289–92, 307; Leary Tr. 202.

Throughout 2017, Leary and Soniat negotiated Mintvest's equity stake.[49] Leary did not contest that Mintvest was diluted by Soniat's cash contributions, but felt that Mintvest should not have been diluted so significantly because Leary had contributed significant "sweat equity."[50] Soniat agreed, and the parties discussed an adjustment over the next several months.[51]

In October 2017, the parties agreed to "peg" Mintvest's interest at a higher percentage.[52] Soniat proposed to "suspend the rebalancing of equity and peg ownership at 85/15."[53] Leary pointed out that the last equity statement he received showed Mintvest's equity "at 18.x%" and that he "reviewed it and it seemed accurate."[54] Leary stated that "if it is accurate, I would prefer 18% to 15%."[55] Leary was "fine with the concept of pegging equity permanently," but the parties "just need[ed] to finalize the amount."[56] Thereafter, Leary and Soniat agreed to peg

---

[49] *See* Leary Tr. 118.

[50] Soniat Tr. 223; *see also* Leary Tr. 118; Carlton Tr. 336–37.

[51] *See, e.g.*, Soniat Tr. 223; Leary Tr. 118; Carlton Tr. 336–38.

[52] *See* JX 27 at COINMINT155291 ("We are going to suspend the rebalancing of equity and peg ownership at 85/15."); JX 28 at 1–4 (reflecting that the parties extensively discussed pegging equity at 85/15).

[53] JX 28 at 3; JX 27 at COINMINT155291; *see also* Carlton Tr. 340–41, 343–44.

[54] JX 28 at 1.

[55] *Id.*

[56] *Id.* at 4.

Mintvest's equity stake at 18.2%,[57] and Soniat agreed that he would only fund the Company with loans going forward, so as to avoid Mintvest's further dilution.[58] Leary was satisfied with their agreement and repeatedly expressed that to Soniat.[59] In keeping with his general distaste for paperwork, Leary said that the agreement did not need to be documented.[60]

Nonetheless, the parties memorialized this agreed-to equity split in a Statement of Changes in Partners' Equity backdated to August 31, 2017 (the "October 2017 Agreement").[61] Leary signed the October 2017 Agreement, and did not suggest or demand that a Board meeting was required to make the 18.2%

---

[57] *See, e.g.*, JX 25; JX 32; Leary Tr. 135–36; Soniat Tr. 222–24, 232, 235–36; Schneider Tr. 406–07.

[58] *See* Soniat Tr. 227–28.

[59] *See id.* 223–24, 231, 228–29, 277–78; JX 1 at MINTVEST00001473 (Leary stating that Soniat's lending money to the Company "is really invaluable").

[60] JX 28 at 1 ("I don't think we would actually need any further paperwork on this. . . . Just my 2 cents for minimizing documentation . . . . Why paper something now that has been as it is for months, and then do it again shortly?"); *see also* Carlton Tr. 345–46 (referring to JX 28 and stating that it "show[s] that Mr. Leary didn't feel it needed to be documented at all," which "was consistent with his general approach that things could be done informally, documentation was a waste of time, et cetera," and further explaining that "[a]t the time, we all knew that Coinmint was likely going to be redomesticated as a Puerto Rican entity, and there was discussion about cleaning up the equity structure and related matters as a part of that domestication process" and "[t]here was a bit of on-again, off-again with regard to this" because "[o]n the one hand, it made sense to wait and do everything at once, especially considering how hard it had been to get signatures and attention on these matters," and "[o]n the other, the redomestication kept dragging out because we were struggling to get a large law firm or CPA to write opinion letters").

[61] *See* JX 25; *see also* JX 32; Schneider Tr. 406–07.

equity split official.[62]  Thus, as with every other Company decision, the October

2017 Agreement was not effectuated through any formal board meeting or written

consent.[63]

---

[62] *See* Leary Tr. 115 (admitting that he never requested a formal Board meeting with Soniat); *id.* 120–22 (admitting that he felt "Ms. Schneider was a bit of a pain in the ass" because she was asking him to sign documents); *id.* 135–36 (admitting that he signed the documents reflecting Mintvest's 18.2% ownership and never requested a Board meeting to make it "official"); Soniat Tr. 275 (explaining that "the word 'board meeting' was never mentioned until he sued me in Delaware"); *see also* Carlton Tr. 335 (explaining that "Leary hated formalities"); Schneider Tr. 406 (stating that it was "very normal" for Leary to forego formalities).

[63] At trial, Leary maintained that he pressed the Company to contemporaneously document transactions and follow formalities, and that he never agreed to dilution. *See* Leary Tr. 54–56 (claiming that he objected to executing documents after the fact because he "always thought it wasn't right," but merely "trusted Ashton" and thought "we're doing things right," while he "put [his] head down" to "make money for the company"); *id.* 77–78 ("Q. . . . [I]n fact, Mr. Leary, Mr. Soniat has contributed far more capital to Coinmint than you have.  Isn't that true?  A. Correct.  Q. But, yet, you don't accept any dilution, do you?  A. No.  Q. . . . Is it true that you do not accept any dilution?  A. Yes.  We wouldn't be here today if I was accepting some type of dilution.  Q. Right.  So despite what you communicated to Mr. Soniat in August of 2016, and despite your never having communicated anything different, you're still claiming in this action that Mr. Soniat owns 50 percent of Coinmint and you own 50 percent of Coinmint; correct?  A. Yeah, obviously. That's why we're here."); *id.* 103–04 ("[M]y understanding with Mr. Soniat was at no time would I be diluted . . . ."); *id.* 202 ("Q. Mr. Leary, you were questioned during cross about the fact that you never objected to being diluted down to 18.2 percent prior to this lawsuit. Why is Mintvest objecting now, when it didn't object at the time you signed this document? A. I thought everything was being done correctly.  I trusted Ashton.  He was my friend.  I trusted he had the professionals that were doing everything as they should.  And the bottom line is I just wanted to work.  I didn't want to fight.  Never wanted to fight.").

In view of the preponderance of the evidence presented, I do not find Leary's testimony on those points to be credible.  "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists." *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967).  "[T]he relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact." *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 453 (Del. Ch. 2012) (quoting *In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008)). Accordingly, I may "determine the weight and credibility to be accorded any witness," and

A series of documents executed after the October 2017 Agreement reflect the agreed-to 81.8% to 18.2% equity split.[64] Leary admits he received these documents and did not protest Mintvest's equity pegged at 18.2%.[65] Mintvest's 18.2% ownership was also confirmed through the Company's 2018 financial statements. In performing an audit, the Company's accountants realized that Mintvest never made a particular equity contribution of 14.001 bitcoins with a market value of

---

am "responsible for resolving conflicts in the evidence." *Johnson v. Wagner*, 2003 WL 1870365, at *4 (quoting *Jones v. Lang*, 591 A.2d 185, 188 (Del. 1990)). "The rule is that in determining the weight and the credibility of the testimony, the apparent fairness, interest or bias of the witnesses, their opportunity to see and know of the circumstances, their recollections connected therewith, and all other facts and circumstances that go to test the accuracy of their testimony, are to be considered." *Matter of Langmeier*, 466 A.2d 386, 405 (Del. Ch. 1983) (citing *Benson v. Wilm. City Ry. Co.*, 75 A. 793 (Del. Super. Ct. 1910)).

At trial, I had ample opportunity to observe Leary and Soniat and to assess their credibility. After listening to Soniat's testimony, which is consistent with that of multiple corroborating witnesses and contemporaneous documents, I find him to be credible concerning the parties' history of eschewing formalities and his course of injecting cash in the form of capital contributions without Leary's objection. *See Johnson*, 2003 WL 1870365, at *4; *see also, e.g.*, Soniat Tr. 216 (testifying that he and Leary would be "50-50 equity owners" and that Leary "would be diluted *pro rata*" if he did not match a contribution, consistent with the Operating Agreement); *id.* 218 (testifying that Leary would have the opportunity to match Soniat's contributions and remain a 50% Member, or forego a match and be diluted); *id.* 223–24 (testifying that they "tracked" and "discussed" Member equity and that "there was nothing hidden or nefarious going on," as Soniat "was putting the money in and, per our agreement," and Leary "was getting diluted, which he never told [Soniat] was an issue" but expressed "that he'd be happy to have a small percent of a successful company and to draw a salary"); Carlton Tr. 348 (testifying that Leary did not "just sign" documents when they were presented to him, but "questioned everything" and was "very suspicious"). Consequently, I place more weight on Soniat's testimony when it conflicts with Leary's.

[64] *See* JX 30; JX 31; JX 59; JX 64A; JX 97; JX 301; JX 302.

[65] *E.g.*, Leary Tr. 137–40, 146–48.

$155,143.68.[66] Without that contribution, Mintvest's equity would be further diluted to approximately 10.69%.[67] The accountants asked Leary about the "[e]quity question" to complete the audit.[68] Leary responded on May 2, 2019: "With regards to the equity, it is the same as the spreadsheet that Kathleen prepared, that I sent you a few days ago (18.2% for Mintvest, the rest in Ashton's entity)."[69] The referenced "spreadsheet" was a version of the October 2017 Agreement.[70] The accountants adjusted the Company's books to support Mintvest's 18.2% ownership.[71]

On August 9, 2019, Leary once more confirmed that he was "100% comfortable with" Mintvest's equity pegged at 18.2%.[72] He also recognized that, compared to CLT, Mintvest "do[es]n't have as much skin in the game, in terms of capital value . . . (in terms of percentages)," and that "there can be only one boss, and that is [Soniat]."[73] Twelve days later, Leary once more recognized Mintvest's

---

[66] *See* JX 85 at COINMINT_158126.

[67] *See* JX 124 at 2.

[68] JX 88 at COINMINT000025; JX 85 at COINMINT_158126.

[69] JX 88 at COINMINT000024; *see also* JX 87.

[70] Leary Tr. 147–48 (discussing JX 87 and JX 88). JX 87 reflects that Leary forwarded Kathleen Schneider's October 18, 2017 email containing the October 2017 Agreement to the auditors on April 29, 2019, four days after they inquired about Leary's equity contributions. *Compare* JX 87 at COINMINT_158101, *with* JX 85 at COINMINT_158126.

[71] *See* JX 88 at COINMINT000020–000023.

[72] JX 99 at COINMINT011920; *see also* Leary Tr. 155 (testifying that, as of early August 2019, he believed that Mintvest held 18.2% and was content with that percentage).

[73] JX 99 at COINMINT011920.

18.2% stake and attempted to use it as leverage: after further discussions, Leary proposed that he be given an option to exit his position as "a minority equity holder."[74] Yet, in this litigation Mintvest seeks equitable relief in this Court based on the assertion that Mintvest continues to hold 50% of the Company.[75]

As promised, Soniat funded the Company's ongoing operations via loans so that Mintvest would not be further diluted. As Soniat testified at trial and as corroborated by the paper record, after October 2017, he loaned tens of millions of dollars to the Company to help keep it afloat, even when it was extremely risky to do so and collapse of bitcoin prices otherwise would have resulted in a bankruptcy.[76] By 2019, he had loaned over $20 million to the Company on CLT's behalf, but had not received any interest payments on those loans.[77] Soniat credibly testified that he would never have put this capital at risk if Leary had not agreed with him that CLT was the 81.8% owner of the Company.[78] CLT does not contend any of these loan infusions were or are dilutive.[79]

---

[74] JX 101 at COINMINT130734.

[75] *See* Am. Compl. ¶¶ 102, 111, 123.

[76] *See* Soniat Tr. 264–65, 267, 278, 294–95, 315; Carlton Tr. 362; JX 102 at COINMINT000031.

[77] *See* JX 102 at COINMINT000031.

[78] Soniat Tr. 278–29.

[79] Soniat's commitment to fund Coinmint only through nondilutive loans faltered once Mintvest filed this litigation, in violation of the status quo order entered in this action,

## C. Coinmint Is Converted To A Puerto Rican Entity.

On or about January 19, 2018, the Company filed a Certificate of Conversion with the Delaware Secretary of State and the Secretary of State (the "Conversion").[80] On January 25, Coinmint domesticated in Puerto Rico.[81] As of that date, Coinmint became and was thereafter operated as a Puerto Rican entity.[82] Mintvest contests the Conversion, pushing that Leary was unaware of the Conversion until September 2019 and that the Conversion is invalid because, with purportedly undiluted voting power, Leary never authorized it on Mintvest's behalf.[83] The record demonstrates that although the Managers did not formally authorize the Conversion via vote or written consent, Leary was fully aware of the Conversion, supported it, and participated in it on Mintvest's behalf, alongside CLT.[84]

---

available at D.I. 67 [hereinafter "SQO"]. In the end, Soniat maintained that all contributions after October 2017 were loans. *See* D.I. 141; D.I. 146; D.I. 147; D.I. 148.

[80] PTO ¶ 30; JX 48.

[81] PTO ¶ 30; JX 49.

[82] *See* JX 48; JX 49.

[83] *See* PTO ¶ 30 ("Petitioner contests whether the Conversion was properly authorized."); Leary Tr. 58 ("Q. . . . Are you aware, sir, currently, that in January 2018, Coinmint was converted from a Delaware LLC to a Puerto Rican LLC? A. I am now. Q. When did you first become aware of that? A. I'm not exactly sure of the time. I believe it was around September of 2019 when I started kind of questioning a lot of the things that were going on in the company."); Am. Compl. ¶ 103 ("Neither Mr. Leary nor any other representative of Mintvest ever authorized the conversion.").

[84] *See, e.g.*, Leary Tr. 58–59 ("Q. Were there discussions in 2017 about having Coinmint take advantage of certain Puerto Rico tax laws? A. Yes."); *id.* 192–93 (confirming Leary had received documents evidencing the Conversion prior to September 2019, and conceding that he never protested in any way Coinmint's redomestication as a Puerto Rican

As early as February 2017, Leary was engaging with Puerto Rican tax counsel.[85] Thereafter, Leary was actively involved in the Company's efforts to gain Puerto Rican tax protections.[86] In conjunction with those tax efforts, the Company considered redomestication as a Puerto Rican entity; Leary was actively involved in that process, participating in numerous discussions with the accountants and lawyers.[87]

Leary participated in April and May 2018 discussions with tax professionals, which explicitly acknowledged that "based on Coinmint's facts, as they stand today, the Puerto Rican company has a US trade or business, meaning that any income from its business operations would be subject to US income taxation,"[88] and that

---

entity before filing this action); Schneider Tr. 412 ("A. When I look back, it was always known that Coinmint was going to eventually move to Puerto Rico. Whether it was going to be an Act 20 company or not was not decided initially. I think there was a lot of tax reviews done by external consultants. But, officially, it did become clear that they decided to move forward with it, and the final decision came in around December or November 2017. And then it actually officially happened in January of 2018. Q. Who was spearheading the efforts for the Puerto Rican conversion? A. Back early on, I was doing a lot of legwork with it, as far as getting the external tax advisors organized. And then the actual conversion, Mr. Leary took over the lead, and I just was the support background.").

This record undermines Leary's position that he was unaware of Coinmint's Conversion and redomestication in Puerto Rico until September 2019. I do not find Leary's testimony credible as his knowledge of the Conversion.

[85] *See* JX 20; Leary Tr. 58–59, 162–63.

[86] *E.g.*, JX 38; JX 40; JX 41; JX 53; JX 56; JX 57; JX 59; JX 61; JX 68; JX 69; JX 71.

[87] *See, e.g.*, Carlton Tr. 339–40, 349.

[88] JX 56 at COINMINT_157229 (identifying Coinmint as a Puerto Rican entity in April 2018); *id.* at COINMINT_156296 (showing that Leary responded to the email identifying Coinmint as redomesticated); *see also* JX 53 at COINMINT_158462 (stating in a March

20

"Coinmint Puerto Rico filed an election to be taxed as a partnership for US tax purposes."[89]  And in June 2018, Leary received a memorandum from the Company's tax advisors that reiterated the 81.8%-18.2% equity split and contained an extensive discussion about "Coinmint's Re-domiciliation to Puerto Rico."[90]

Throughout 2018 and 2019, Leary spearheaded the preparation of an Offering Memo, or "White Paper," to be used in conjunction with a proposed offering of bitcoin tokens.[91]  The White Paper, dated August 2018, expressly states under the heading "Corporate Structure & Ownership" that "Coinmint, LLC was formed as a Delaware limited liability company in 2016 and reorganized as a Puerto Rico limited liability company in early 2018."[92]

Further, in spring 2018, Leary negotiated a collaboration agreement for the Company.[93]  Both the draft agreement and the final version Leary signed state that Coinmint is a Puerto Rican limited liability company.[94]  And in November 2018, Leary received an email from an attorney representing the Company.[95]  That email

2018 email delivered to Leary that "tax counsel told us that going from one jurisdiction (DE) to another (PR), did not require a new EIN").

[89] JX 57 at COINMINT_157305; *accord* JX 59 at COINMINT_157313, -157315.

[90] JX 59 at COINMINT_157312, -157317–157328; *see also* Leary Tr. 170–71.

[91] *See* JX 60; Leary Tr. 170–72; Soniat Tr. 245.

[92] JX 60 at COINMINT_157348; *see also* Leary Tr. 172.

[93] *See* Leary Tr. 182.

[94] *See* JX 303 at COINMINT118537; JX 304 at COINMINT145499.

[95] *See* JX 73; Leary Tr. 189–90.

asked whether Leary "originally organize[d] Coinmint as a Delaware LLC," and went on to explain, "That is what the contract says and also the PR certificate of incorporation is dated as of January 2018, so I guess you converted to a PR entity. If that is so, please confirm and send me a copy of the conversion documents."[96] Leary thereafter confirmed the Conversion, asking the Company's controller to forward a copy of the requested conversion documents; she did, copying Leary.[97]

Finally, in July 2019, Leary, acting and signing as President of Coinmint, caused the Company to file a Form D with the Securities and Exchange Commission in connection with a proposed exempt offering of securities.[98] The Form D provides that the "Jurisdiction of Incorporation/Organization of Coinmint, LLC" is "PUERTO RICO."[99] Based on these facts, Coinmint has been a Puerto Rican entity since January 2018.

## D. Leary And Soniat's Relationship Deteriorates.

Leary and Soniat's relationship deteriorated over time, taking its toll on Coinmint. By 2019, Leary and Soniat disagreed as to how the Company should be run and managed.[100] Soniat believed Leary was struggling to keep things afloat and

---

[96] JX 73 at COINMINT000056.

[97] *See id.*

[98] *See* JX 97 at 1, 2, 5.

[99] *Id.* at 1.

[100] *See* Soniat Tr. 249–51.

therefore installed a CFO and COO.[101] Leary did not respond well to these changes.[102] At the same time, Soniat learned about other problems related to Coinmint's business and management, including, *inter alia*, that Leary had been hiding the Company's bills from management and others.[103]

Accordingly, on December 2, 2019, CLT, as Coinmint's 81.8% Manager and 81.8% Member,[104] approved resolutions (i) amending the Operating Agreement to provide that "[a] majority of the members shall determine the composition of the Board, and that "[a]ny Manager may be removed from the Board with or without cause by a Majority Vote of the Members";[105] (ii) removing Leary from the Board under those amended terms;[106] and (iii) designating CLT as Coinmint's sole Manager.[107] CLT and Mintvest, via Leary and Soniat, are not able to continue working together on day-to-day tasks going forward.[108]

---

[101] *See id.*

[102] *See id.*

[103] *See id.* 251–52, 269–70, 272–73; *see also* JX 99 at COINMINT011920; JX 101 at COINMINT130734; JX 102 at COINMINT000030–000031.

[104] *See* JX 108 at COINMINT_157544 (indicating that CLT effectuated the resolution with "81.8% Voting Rights"); JX 109 at COINMINT_157545 (same); JX 110 at 1 (same).

[105] JX 109 at COINMINT_157545.

[106] JX 108 at COINMINT_157544; PTO ¶ 31.

[107] JX 110 at 1; PTO ¶ 31.

[108] PTO ¶¶ 32, 33.

### E. This Action Follows.

Mintvest filed this action against CLT in December 2019.[109]  On March 2, 2020, Mintvest filed the operative Amended Complaint.[110]  Count I seeks to nullify the Conversion.[111]  Count II seeks dissolution pursuant to 6 *Del. C.* § 18-802, or alternatively, equitable dissolution.[112]  Count III seeks a declaration of the Company's proper managers pursuant to 6 *Del. C.* § 18-110.[113]  Mintvest alleged that "[t]his Court has subject matter jurisdiction over this case under Sections 18-110, 18-111, and 18-802 of the [Delaware Limited Liability Company] Act,"[114] as "Delaware courts have a significant interest in adjudicating disputes implicating the internal affairs, conversion (a form of cancellation), and dissolution of Delaware entities"[115] and "[r]egardless of whether Coinmint is a Delaware LLC or a Puerto Rican LLC, the Operating Agreement provides that Delaware law controls."[116]

On March 17, CLT moved to dismiss, asserting in part under Court of Chancery Rule 12(b)(1) that this Court lacked subject matter jurisdiction over

---

[109] *See* D.I. 1.

[110] *See generally* Am. Compl.

[111] *See id.* ¶¶ 100–06.

[112] *See id.* ¶¶ 107–17.

[113] *See id.* ¶¶ 118–28.

[114] *Id.* ¶ 21.

[115] *Id.* ¶ 22.

[116] *Id.* ¶ 26.

Counts II and III because Coinmint was converted to a Puerto Rican entity.[117]  I cautiously denied CLT's motion, pointing out that "the factual and legal findings and ruling on the conversion claim and the related ownership claim are the gatekeepers for whether the alternative claim seeking dissolution of a Puerto Rican entity is even reached," and that "it would be inappropriate for me to dismiss that claim when it's possible that the gatekeeping claims will be found to result in a Delaware entity over which this court does have subject matter jurisdiction."[118]

On May 6, CLT answered the Amended Complaint, asserting several affirmative defenses, including that Mintvest's claims are barred by unclean hands, waiver, and estoppel; and that the Court lacks jurisdiction over the Company.[119] Thereafter, the parties proceeded through discovery.

On May 19, I entered a status quo order (the "SQO").  Throughout the action's pendency, both parties filed several motions to enforce the SQO.[120]  Many motions were well-founded; Soniat struggled to observe corporate formalities in funding the Company's operations, and Leary divulged confidential Company information and

---

[117] *See* D.I. 20; D.I. 34.

[118] *See* D.I. 55 at 57–58.

[119] *See* D.I. 46 at 52–53.

[120] *E.g.*, D.I. 299; D.I. 297; D.I. 292; D.I. 293; D.I. 274; D.I. 261; D.I. 232; D.I. 231; D.I. 214; D.I. 212; D.I. 209; D.I. 206; D.I. 200; D.I. 195; D.I. 177; D.I. 176; D.I. 174; D.I. 165; D.I. 155; D.I. 148; D.I. 146; D.I. 141; D.I. 140; D.I. 134; D.I. 131; D.I. 128; D.I. 123; D.I. 116; D.I. 108; D.I. 103; D.I. 102; D.I. 93; D.I. 88; D.I. 81.

interfered with Company operations in an attempt to steer the Company in his preferred direction.

I held trial in this matter on February 2 and 3, 2021.[121]  Thereafter, as the parties completed post-trial briefing and through post-trial argument on April 20,[122] the parties continued to spar over alleged SQO violations.[123]

On May 18, I issued an order establishing that Coinmint was converted to a Puerto Rican entity and vacating the status quo order (the "Order").[124]  The Order concluded that the preponderance of the evidence presented at trial established that (1) Mintvest was diluted to an 18.2% minority Member in October 2017; (2) while the parties did not adhere to the Operating Agreement's formalities in effectuating that dilution, Leary actively waived Mintvest's right to avail itself of those protections; (3) Leary was an active participant in executing the redomestication plan, the Conversion was valid, and Coinmint became a Puerto Rican entity; and (4) Mintvest failed to establish a basis to support the extreme remedy of

---

[121] *See* D.I. 235; D.I. 236.

[122] *See* D.I. 270; D.I. 278; D.I. 282; D.I. 283; D.I. 298; D.I. 304.

[123] *See, e.g.*, D.I. 261; D.I. 274.

[124] D.I. 305 [hereinafter "Order"].

26

dissolution.[125]  As promised in the Order, a fuller explication of those conclusions follows.[126]

## II.  ANALYSIS

The parties have the burden of proving their respective claims by a preponderance of the evidence presented at trial.[127]  "Proof by a preponderance of the evidence means proof that something is more likely than not."[128]  This "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not. By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise" the party carrying the burden will lose.[129]

---

[125] *Id.* ¶ 1.  The Order also concluded that, as a result of Mintvest's minority status, CLT had the authority to amend the Operating Agreement, remove Leary as Manager, and install CLT as Coinmint's sole Manager.  *Id.*  But upon further investigation, as discussed *infra*, this Court's jurisdiction cannot reach the Company's post-Conversion management.  The Order is vacated to the extent it addressed any post-Conversion amendments of the Operating Agreement, removal of Leary as Manager, and appointment of CLT as the Company's sole Manager.  To the extent this Opinion conflicts or is inconsistent with the Order, this Opinion governs.

[126] *Id.* ¶ 1.

[127] *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015).

[128] *Id.* (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)).

[129] *Id.* (internal quotation marks and footnotes omitted) (quoting *Agilent Techs., Inc.*, 2010 WL 610725, at *13, and then quoting *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015)).

When CLT and Mintvest executed the Operating Agreement, they mutually understood that they would be Coinmint's equal equity holders, and that either could be diluted by the other's capital contribution. This "shared expectation[]" at the time of contracting is reflected in the four corners of the Operating Agreement,[130] which identifies Mintvest as Coinmint's 50% owner and provides that dilution via capital contribution could alter a Member's equity interest, or "Sharing Ratio" reflected on Schedule I, "from time to time" in accordance with Section 3.2 of the Operating Agreement.[131] That section prescribed certain formalities to effectuate dilution via capital contribution, including giving Members written notice of a capital call. CLT and Mintvest do not dispute that these procedures were never followed.

Mintvest maintains that it was not properly diluted because CLT's cash infusions did not adhere to Section 3.2's formalities for facilitating dilution via capital contribution and Leary did not agree to dilution, so CLT's cash infusions should therefore be treated as loans. Specifically, Mintvest argues that the Court must enforce the Operating Agreement's terms as written because (1) it provides that

---

[130] *Exelon Generation Acqs., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017); *see GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."); *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *15 (Del. Ch. May 29, 2015) ("[T]he Court must give effect to the parties' intentions and is to attempt to determine those intentions first by looking to the four corners of the contract.").

[131] *See* Op. Agr. § 1(rrr).

Mintvest owns 50% of Coinmint, (2) Mintvest bargained for its protections against dilution, and (3) CLT cannot excuse its failure to comply with the Operating Agreement's formalities, as the Operating Agreement contains integration and "no waiver" provisions.[132] As a result, Mintvest maintains that Leary's removal as Manager and the Company's Conversion are invalid, and the Company should be dissolved.

CLT maintains that Mintvest was diluted notwithstanding the Operating Agreement's terms because Leary and Mintvest set those terms aside through waiver, estoppel, and acquiescence. CLT asserts Leary not only agreed that Mintvest would be an 18.2% owner, but also advocated for it and confirmed it on multiple occasions. On that basis, CLT presses that the Court should treat the October 2017 Agreement as a written amendment to the Sharing Ratios set forth on Schedule I of the Operating Agreement. CLT also relies on the equitable defenses of quasi-estoppel and laches.

The parties do not dispute the Operating Agreement's meaning and mandate, nor that they did not follow it. This matter hinges on whether CLT has carried its burden on its affirmative defenses to determine whether Mintvest was diluted to a minority position. I am satisfied that the greater weight of the evidence rests on CLT's side of the scale. Under the doctrines of waiver, estoppel, and acquiescence,

---

[132] *See* D.I. 278 at 16–30; D.I. 283 at 9–21.

I conclude that CLT's cash infusions were capital contributions, and that Mintvest agreed to dilution notwithstanding the Operating Agreement's requirements and is therefore an 18.2% Member. Under those same doctrines, and in view of CLT's majority voting power, Mintvest's claim that the Conversion was invalid because it was effectuated without its vote or consent also fails.

These determinations resolve Count I in CLT's favor. But as discussed below, my ability to adjudicate Counts II and III depends on whether this Court's jurisdictional reach confers the power to dissolve a Puerto Rican entity and declare its managers. Based on my mandate to police subject matter jurisdiction, I *sua sponte* revisit the issue raised in CLT's Motion to Dismiss and determine that principles of statutory interpretation, equity, and comity foreclose this Court from deciding Counts II and III; those claims must be adjudicated in the Puerto Rican Courts, and are dismissed.

**A. Based On Its Equitable Defenses, CLT Has Demonstrated That Mintvest Was Diluted To 18.2% And Coinmint Was Converted To A Puerto Rican Entity.**

Limited liability companies are creatures of contract.[133] The Delaware Limited Liability Company Act (the "Act") rests on the fundamental policy of

---

[133] *E.g.*, *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members.").

freedom of contract.[134]  As an enabling statute, "[t]he Act is replete with fundamental

provisions made subject to modification in the [a]greement,"[135] and therefore "leaves

latitude for substantial private ordering," provided that statutory and judicially

imposed parameters are honored.[136]  The Act contains relatively few mandates, and

it explicitly assures that contractual arrangements will be given effect to the fullest

permissible extent.[137]

Although the Act provides default and gap-filling provisions,[138] the limited

liability company agreement serves as the primary source of rules governing the

---

[134] *See* 6 *Del. C.* § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements.").

[135] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999).

[136] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 116 (Del. 2020) ("At its core, the [the Act, like the DGCL] is a broad enabling act which leaves latitude for substantial private ordering, provided the statutory parameters and judicially imposed principles of fiduciary duty are honored." (quoting *Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996))); *see Achaian, Inc. v. Leemon Fam. LLC*, 25 A.3d 800, 802 (Del. Ch. 2011) (stating that "the Delaware Limited Liability Company Act, an enabling statute whose primary function is to fill gaps, if any, in a limited liability company agreement").

[137] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 1.03[A][1], at 1-14 (2d ed. 2019).

[138] *See id.* § 1.03[A][1][b] & [A][2], at 1-14 to 1-15; *Huatuco v. Satellite Healthcare*, 2013 WL 6460898, at *1 (Del. Ch. Dec. 9, 2013) ("Delaware law with regard to limited liability companies is contractarian; individuals may create an organization that reflects their perception of the appropriate relationships among the parties, most conducive to their interests, as represented by their mutual agreement.  Chapter 18 of Title 6 of the Delaware Code provides default provisions applicable to Delaware LLCs where the parties' agreement is silent; where they have provided otherwise, with limited exceptions, such agreements will be honored by a reviewing court." (footnote omitted)), *aff'd*, 93 A.3d 654 (Del. 2014).

31

"affairs of a limited liability company and the conduct of its business."[139]  "[S]uch agreements operate to displace otherwise applicable default provisions in [the] Act."[140]  Delaware's LLC law is therefore "explicitly contractarian,"[141] and fundamentally regards and enforces the limited liability company agreement as a contract.[142]  Our Courts construe such agreements as any other contract, by "effectuat[ing] the parties' intent based on the parties' words and the plain meaning of those words."[143]

Actions that do not comport with an operating agreement's terms may be void or voidable.

> Void acts are those the entity itself has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy.  Stated differently, they are acts that the entity lacks the power or capacity to effectuate.  Voidable acts are within the power or capacity of an entity, but were not properly authorized or effectuated by the representatives of the entity.[144]

---

[139] 6 *Del. C.* § 18-101(9).

[140] *RED Cap. Inv. L.P. v. RED Parent LLC*, 2016 WL 612772, at *2 (Del. Ch. Feb. 11, 2016).

[141] *Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *1 (Del. Ch. Jan. 13, 2014) ("Delaware's law with respect to LLCs, as this Court has repeatedly noted, is explicitly contractarian; it allows those associating under this business format to structure their relationship in the way they believe best suits them and their business.").

[142] *See, e.g.*, *Zimmerman v. Crothall*, 62 A.3d 676, 690–91 (Del. Ch. 2013).

[143] *Id.* at 690.

[144] *CompoSecure, L.L.C. v. CardUX, LLC* (*CompoSecure I*), 2018 WL 660178, at *26 (Del. Ch. Feb. 1, 2018) (footnotes and internal quotation marks omitted) (quoting *Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000)), *aff'd in part, rev'd in part on other grounds*, *CompoSecure, L.L.C. v. CardUX, LLC* (*CompoSecure II*), 206 A.3d 807 (Del. 2018).

As explained in the corporate context, "[t]he common law rule is that void acts are *ultra vires* and generally cannot be ratified, but voidable acts are acts falling within the power of a corporation, though not properly authorized, and are subject to equitable defenses."[145]  Action that is otherwise permissible, but fails to adhere to provisions of a limited liability company agreement, is voidable, not void,[146] and so can be "validated in equity."[147]  "[V]oidable acts are ratifiable because the [entity]

---

[145] *CompoSecure II*, 206 A.3d at 816–17; *see Michelson v. Duncan*, 407 A.2d 211, 218–19 (Del. 1979) ("The essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are [u]ltra vires, fraudulent or gifts or waste of corporate assets."); *Solomon* , 747 A.2d at 1114 ("Void acts are those acts that the board, or more generally the corporation, has no implicit or explicit authority to undertake or those acts that are fundamentally contrary to public policy.  As defined by decisional law, void acts are those acts that are not performed in the interest of the corporation, irrespective of whether or not they are authorized by a corporation's certificate of incorporation.  The list of void acts, while not exclusive, is nonetheless very restricted.  Void acts include fraud, gift, waste, or *ultra vires* acts.").

[146] *See CompoSecure II*, 206 A.3d at 816–17; *Klaassen v. Allegro Dev. Corp.* (*Klaassen II*), 106 A.3d 1035, 1046–47 (Del. 2014).

[147] *Klaassen v. Allegro Dev. Corp.* (*Klaassen I*), 2013 WL 5739680, at *15 (Del. Ch. Oct. 11, 2013) ("Void acts contrast with voidable acts, which can be ratified or validated in equity."), *aff'd*, *Klaassen II*, 106 A.3d 1035; *see also In re Oxbow Carbon LLC Unitholder Litig.*, 2018 WL 818760, at *48 (Del. Ch. Feb. 12, 2018) ("There is no dispute that Oxbow had the power as an entity to issue units and admit new members. Oxbow could have issued units to the Small Holders and admitted them as members, if the parties had adhered to the procedures specified in the LLC Agreement.  Consequently, assuming for the sake of analysis that the parties failed to follow the requisite procedures, the issuance of units to the Small Holders and their admission as members would be voidable, not void."), *aff'd in part, rev'd in part on other grounds sub nom. Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482 (Del. 2019).

can lawfully accomplish them if it does so in the appropriate manner."[148]  Where

"disputed corporate actions . . . lawfully could have been accomplished by the

Defendants had they done them in the appropriate manner, *i.e.*, had they given proper

notice of the [action]," and where those "actions were in the interest of [the

corporation] and did not constitute *ultra vires* acts, fraud or corporate waste," they

are "voidable actions susceptible to cure by" equitable defenses.[149]  Drafters of

operating agreements are also free to use their flexibility in contracting to agree that

failure to follow certain procedures means an otherwise voidable action is void.[150]

"[T]he contractual imposition of voidness trumps the common law."[151]

---

[148] *Nevins v. Bryan*, 885 A.2d 233, 245 (Del. Ch.) ("Void acts are not ratifiable because the corporation cannot, in any case, lawfully accomplish them.  Void acts are illegal acts or acts beyond the authority of the corporation.  In contrast, voidable acts are ratifiable because the corporation can lawfully accomplish them if it does so in the appropriate manner." (footnotes and internal quotation marks omitted) (quoting *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 896 (Del. Ch. 1999))), *aff'd*, 884 A.2d 512 (Del. 2005).

[149] *Id.* at 246; *see also Lofland v. DiSabatino*, 1991 WL 138505, at *1 (Del. Ch. July 25, 1991) (holding that defective notice of annual meeting rendered director election voidable, not void).

[150] *E.g.*, *CompoSecure II*, 206 A.3d at 817 ("Ordinarily, the Sales Agreement would be voidable for failure to comply with the Restricted Activities Provision.  But, given the plain language of the Restricted Activities Provision—'void and of no force or effect whatsoever'—its application would trump the common law rule and render the Sales Agreement void and incapable of being ratified." (footnote omitted)); *Absalom Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at *4 (Del. Ch. June 27, 2019) ("Although *CompoSecure* addressed the defense of ratification, its logic extends to other equitable defenses as well.  At common law Anne's transfer of her membership interest to Absalom would be likely be voidable, not void.  The reasoning in *CompoSecure*, however, mandates that the contractual language—'void'—trumps the common law, rendering the assignment ineffective and invulnerable to equitable defenses.").

[151] *Absalom*, 2019 WL 2655787, at *6.

Thus, where (1) the Act enables the entity or its representatives to take certain action as distilled in the operating agreement; (2) the operating agreement implements that grant of authority and prescribes certain approvals for effectuating it; and (3) the operating agreement does not expressly deem the action void for failure to obtain those approvals, that action will be "voidable, not void," as the entity and its representatives could have carried out the action had "the proper approvals had been obtained."[152]  Such voidable breaches of LLC agreements are subject to equitable defenses, including waiver, estoppel, and laches.[153]

"Any one may forego a right intended for his own benefit in the absence of some rule of public policy."[154]  "[I]naction or silence on the part of a plaintiff, in certain circumstances, can bar a plaintiff from relief both equitable and legal."[155]  Delaware has implemented this umbrella rule through the doctrines of waiver, estoppel, and acquiescence.  While these are "related" doctrines that invoke similar

---

[152] *CompoSecure I*, 2018 WL 660178, at *27.

[153] *See, e.g.*, *id.* at *26 ("Voidable acts can be validated by equitable defenses, such as ratification and acquiescence."); *Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 113 n.38 (Del. Ch. 2006) (considering and applying the equitable defense of laches under an LLC agreement).

[154] *Nathan Miller, Inc. v. N. Ins. Co. of N.Y.*, 39 A.2d 23, 25 (Del. Super. Ct. 1944).

[155] *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *10 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014); *see In re PNC Del. v. Berg*, 1997 WL 720705, at *4 (Del. Super. Oct. 22, 1997) ("[H]owever one characterizes the behavior of the Bank, whether it be in terms of waiver, acquiescence, estoppel, abandonment, or novation, the evidence is overwhelming that the Bank forewent its claim on the contract rights connected with the files that went to the Tighe firm.").

analyses, they are "not coterminous"[156] and "may not be invoked to make a new contract, or to change radically the terms of the policy to cover additional subject matter."[157]

## 1.    Mintvest Was Diluted To 18.2%.

The Company's Delaware Operating Agreement is a contract governed by the Act.  The drafters included certain terms governing capital contributions and their dilutive effect:  the Board must notify Members in writing of cash needs, each Member's share, and the date the capital contribution is due; a nonpaying Member is deemed non-contributing; and the Board adjusts the Sharing Ratios accordingly.[158] In turn, Board action requires the approval of a majority of the Managers, and all Board action is to be taken at a minuted meeting or by written consent.[159]  The Operating Agreement does not specify that bilateral noncompliance with those terms

---

[156] *Roam-Tel P'rs v. AT&T Mobility Wireless Operations Hldgs., Inc.*, 2010 WL 5276991, at *9 (Del. Ch. Dec. 17, 2010) (quoting *St. Jones River Gravel Co. v. Hartford Fire Ins. Co.*, 1980 WL 308672, at *3 (Del. Super. July 7, 1980)); *see Kahn v. Household Acq. Corp.*, 591 A.2d 166, 176 (Del. 1991) ("Estoppel and acquiescence are related doctrines of equity."); *Seokoh, Inc. v. Lard-PT, LLC*, 2021 WL 1197593, at *14 n.180 (Del. Ch. Mar. 30, 2021) (relying on waiver principles in concluding that a party acquiesced in a breach); *Vila v. BVWebTies LLC*, 2010 WL 3866098, at *9 n.68 (Del. Ch. Oct. 1, 2010) (acknowledging the similarities between waiver and acquiescence).

[157] *St. Jones River Gravel*, 1980 WL 308672, at *2.

[158] Op. Agr. § 3.2.

[159] *Id.* §§ 4.3(f), 4.4.

would void any action, although a Manager acting unilaterally has no power or authority to bind the Company.[160]

Mintvest claims that CLT and Mintvest failed to adhere to those terms in diluting Mintvest's Sharing Ratio (and ultimately leveraging Mintvest's diluted position to cause the Conversion). This series of actions was a voidable breach of the Operating Agreement. CLT does not dispute that it and Mintvest failed to adhere to the Operating Agreement, but asserts that failure is excused under well-established equitable defenses. Thus, I consider the parties' conduct after executing the Operating Agreement through that lens.

### a. Mintvest Waived The Operating Agreement's Dilution Requirements.

"It is well settled in Delaware that contractual requirements or conditions may be waived."[161] Delaware's standard for proving waiver is "quite exacting."[162] "Waiver is the voluntary and intentional relinquishment of a known right" either conferred by statute or secured by contract.[163] "It implies knowledge of all material

---

[160] *Id.* § 4.5.

[161] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (citing *Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972)).

[162] *Id.* (quoting *Am. Fam. Mortg. Corp. v. Acierno*, 640 A.2d 655 (Del. 1994)); *accord Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 27 A.3d 522, 529–30 (Del. 2011).

[163] *AeroGlobal*, 871 A.2d at 444; (quoting *Realty Growth Invs. v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982)); *see Components, Inc. v. W. Elec. Co.*, 267 A.2d 579, 582 (Del. 1970) (acknowledging that party can waive contractual or statutory rights).

facts and an intent to waive, together with a willingness to refrain from enforcing those contractual rights.[164] "Waiver is a unilateral action and depends on what one party intended to do, rather than upon what he induced his adversary to do, as in estoppel."[165] "Unlike estoppel, waiver does not necessarily imply that one party to the controversy has been misled to his detriment in reliance on the conduct of the other party."[166]

A party asserting waiver must demonstrate that (1) there is a requirement or condition to be waived; (2) the waiving party knew of the requirement or condition; and (3) the waiving party intended to waive that requirement or condition.[167] "The facts relied upon to prove waiver must be unequivocal."[168] If a waiver occurs, "[a] waiving party typically is prohibited from retracting its waiver if the non-waiving party has suffered prejudice or has relied to his detriment on the waiver."[169]

---

[164] *AeroGlobal*, 871 A.2d at 444.

[165] *Roam-Tel P'rs*, 2010 WL 5276991, at *9 (internal quotation marks omitted) (quoting *Nathan Miller*, 39 A.2d at 25); *see George v. Frank A. Robbino, Inc.*, 334 A.2d 223, 224 (Del. 1975) ("Intention forms the foundation of the doctrine of waiver, and it must clearly appear from the evidence.").

[166] *Roam-Tel P'rs*, 2010 WL 5276991, at *9 (internal quotation marks omitted) (quoting (quoting *Nathan Miller*, 39 A.2d at 25).

[167] *E.g.*, *AeroGlobal*, 871 A.2d at 444.

[168] *Id.*; *accord Amirsaleh*, 27 A.3d at 529 ("[T]he facts relied upon to demonstrate waiver must be unequivocal."); *Realty Growth Invs.*, 453 A.2d at 456 ("The facts relied upon for proof [of waiver] must be unequivocal in character.").

[169] *Amirsaleh*, 27 A.3d at 529–30.

This exacting standard has been met here. Section 3.2 includes requirements or conditions that must be satisfied for a dilutive capital contribution. Leary was aware of Mintvest's right to invoke those provisions; nothing in the credible record indicates that he was unaware of Section 3.2's mandate. Nonetheless, the preponderance of the evidence supports the conclusion that Leary unequivocally waived Section 3.2's requirements by negotiating for and agreeing to "peg" his ownership interest at 18.2% in view of CLT's capital contributions.

Between 2016 and 2017, Leary repeatedly and informally requested capital from CLT, and CLT provided that capital without insisting on formalities. Leary acknowledged that Mintvest's ownership interest had been significantly diluted to below 5%. Believing Mintvest deserved a greater stake in the Company because of Leary's "sweat equity," Leary requested and Soniat agreed to increase and "peg" Mintvest's interest at 18.2%.[170] Leary never objected that CLT's capital contributions did not follow Section 3.2's requirements and should therefore be treated as non-dilutive loans. This was consistent with Leary's insistence that Soniat forego formal processes, Soniat's agreement, and the resultant lack of formal board meetings, written consents, or any similar processes.

In fact, after pegging Mintvest's equity at 18.2%, Leary again tried to avoid formalities, saying that the new 18.2% interest agreement did not need to be

---

[170] *See* JX 27 at COINMINT155291; JX 28 at 1–4.

documented. But Soniat insisted, and the parties memorialized the agreed-to equity split in the October 2017 Agreement, which Leary executed without suggesting or demanding that a Board meeting was required to make the 18.2% equity split official.[171] And a series of documents Leary received and executed without protest after the October 2017 Agreement reflects the agreed-to 81.8% to 18.2% equity split.[172] In fact, on May 2, 2019, Leary informed the Company's accountants that Mintvest's equity "is the same as the spreadsheet that Kathleen prepared, that I sent you a few days ago (18.2% for Mintvest, the rest in Ashton's entity)."[173] On August 9, Leary once more confirmed that he was "100% comfortable with" Mintvest's equity pegged at 18.2%.[174] Twelve days later, Leary again recognized Mintvest's 18.2% stake attempting to use it as leverage to support that he be given an option to exit his position as "a minority equity holder."[175] The preponderance of the evidence demonstrates that Mintvest unequivocally waived the formalities set forth in Section 3.2.

---

[171] *See* JX 25; JX 32; Leary Tr. 115, 120–22, 135–36; Soniat Tr. 275; Carlton Tr. 335; Schneider Tr. 406–07.

[172] *See* JX 30; JX 31; JX 59; JX 64A; JX 97; JX 301; JX 302; Leary Tr. 137–40, 146–48.

[173] JX 88 at COINMINT000024; *see also* JX 87; Leary Tr. 147–48.

[174] JX 99 at COINMINT011920; *see also* Leary Tr. 155.

[175] JX 101 at COINMINT130734.

### b. Mintvest Is Estopped From Invoking The Operating Agreement's Dilution Requirements.

Unlike waiver, "[e]stoppel depends on what a party caused another to do, and involves an element of reliance."[176] "Estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might perhaps have otherwise existed, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse."[177] Thus, "[t]he doctrine of equitable estoppel arises when, by its conduct, a party intentionally or unintentionally leads another, in reliance on that conduct, to change position to his detriment,"[178] and will only be found where "one who has been induced to alter his line of conduct, with respect to the subject matter in controversy, so as to have subjected himself to some liability, he would not otherwise have incurred, or to have foregone some right or remedy which he otherwise would have taken."[179]

As with waiver, the preponderance of the evidence supports a finding of estoppel, as Leary's repeated failure to invoke Section 3.2's protections caused CLT

---

[176] *Roam-Tel P'rs*, 2010 WL 5276991, at *9.

[177] *Kahn*, 591 A.2d at 176 (alterations and internal quotation marks omitted) (quoting 3 J. Pomeroy, *Equity Jurisprudence* § 804, at 189 (1941)).

[178] *Roam-Tel P'rs*, 2010 WL 5276991, at *9.

[179] *Id.* (quoting *Wilds v. Attix*, 4 Del. Ch. 253, 262–63 (1871)).

to act to its detriment. Leary represented to Soniat that he would accept dilution in view of CLT's capital contributions, and CLT, through no negligence of its own, acted or changed its position to its detriment. CLT's detriment is twofold.

First, because Leary regularly contested formalities, Soniat did not invoke Section 3.2's procedures despite his preference for documentation and bookkeeping. Rather, he followed Leary's lead, providing capital when Leary requested it to fund Coinmint's operations, but testified that he would have held formal meetings and solicited formal consents.[180]

Second, Soniat infused the Company with significant funds from CLT.[181] Consistent with their early understanding as consummated in the Operating Agreement that CLT would provide capital and Mintvest could consequently be diluted, and as a result of Leary's failure to object or demand otherwise, Soniat continued to fund Coinmint's operations while believing that those funds were categorized as dilutive capital contributions and that CLT was accruing a greater equity stake in the Company.[182]

---

[180] Soniat Tr. 276.

[181] *See* JX 15 at COINMINT_157205; JX 64A at COINMINT_157468.

[182] *See* JX 4 at COINMINT071042; JX 5 at COINMINT065914; JX 7 at COINMINT157137; JX 15 at COINMINT_157205; JX 64A at COINMINT_157468; Leary Tr. 77.

Soniat's belief was affirmed and reinforced by his negotiations with Leary and their mutual acknowledgement that CLT's contributions were, in fact, dilutive. Throughout 2017, Leary was aware of and acted on Soniat's belief that dilution was mutually accepted. When Leary agreed that Mintvest had been diluted and pressed his belief that it should be diluted no further than 18.2%, notwithstanding CLT's significant contributions, Soniat agreed that Mintvest's equity would be pegged at that percentage. CLT therefore agreed to categorize all future cash infusions as loans in order to preserve Mintvest's equity, and relied on Mintvest's agreement to the 81.8%-18.2% equity split in advancing tens of millions of dollars to Coinmint in the form of loans. As Soniat testified without contradiction or cross-examination, he never would have done that had there not been agreement that CLT was the 81.8% owner of Coinmint (as opposed to 50%), nor would it have made economic sense for him to do so. Accordingly, all of the elements of estoppel have been met.

### c. Mintvest Acquiesced In Being Diluted To 18.2%, Despite Section 3.2's Protections.

As recognized by Vice Chancellor Glasscock, "[t]he doctrine of acquiescence effectively works an estoppel: where a plaintiff has remained silent with knowledge of her rights, and the defendant has knowledge of the plaintiff's silence and relies on that silence to the defendant's detriment, the plaintiff will be estopped from seeking

protection of those rights."[183] In order to prevail on an acquiescence defense, a defendant must show that (1) the plaintiff remained silent (2) with knowledge of her rights (3) and with the knowledge or expectation that the defendant would likely rely on her silence, (4) the defendant knew of the plaintiff's silence, and (5) the defendant in fact relied to her detriment on the plaintiff's silence.[184]

For similar reasons discussed above, these elements are satisfied here. Mintvest concedes as much, contesting only one element: that Mintvest had knowledge of its rights. Specifically, Mintvest contends that it "did not have knowledge of its rights because it did not realize that a wrong had been committed," because "[a]s Leary testified, he was relying on CLT and his friend to make sure everything was done appropriately and accurately."[185] But as noted above, Leary was aware of the Operating Agreement's terms, and nothing indicates that Soniat or

---

[183] *Lehman Bros.*, 2014 WL 718430, at *9; *see Kahn*, 591 A.2d at 176 ("Acquiescence in the wrongful conduct of another by which one's rights are invaded may often operate, upon the principles of and in analogy to estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would otherwise be entitled." (alteration omitted) (quoting 3 J. Pomeroy, *Equity Jurisprudence* § 817, at 245 (1941))).

[184] *Lehman Bros.*, 2014 WL 718430, at *10; *see Klaassen*, 2013 WL 5739680, at *20 (stating acquiescence is found where a party "has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; *or* (2) freely does what amounts to recognition of the complained of act; *or* (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved," and "[a]s the disjunctive framing indicates, a defendant need only establish one of the bases for acquiescence" (emphasis in original) (quoting *NTC Gp., Inc. v. W. Point-Pepperell, Inc.*, 1990 WL 143842, at *5 (Del. Ch. Sept. 26, 1990))).

[185] D.I. 278 at 29 (citing Leary Tr. 54–55).

44

CLT acted to obscure Leary's right to invoke its protections. Instead, Leary actively solicited Soniat's funds, with objecting to their form or injection process, to quickly purchase equipment Leary ordered and believed was necessary for Coinmint's business. Leary knew that Mintvest had been diluted down to around 5.5% by the end of 2016, signing a capital statement reflecting that dilution.[186] Leary then negotiated for a larger stake, eventually agreeing to the 18.2% stake reflected in the October 2017 Agreement. Mintvest does not identify a single fact of which it was unaware, and therefore its sole defense to the application of the doctrine of acquiescence—that Mintvest did not have knowledge of its rights because it did not realize that the wrong had been committed—fails.

### d. The Operating Agreement's Anti-Waiver And Integration Provisions Do Not Change This Outcome.

Mintvest argues that the Operating Agreement's integration and anti-waiver provisions preclude CLT's defensive theories. Delaware law recognizes the important policy considerations underlying integration and anti-waiver provisions, and enforces both.[187] But when applied to post-contract behavior, these principles

---

[186] *See* JX 25.

[187] *Rehoboth Mall Ltd. P'ship v. NPC Int'l, Inc.*, 953 A.2d 702, 704–05 (Del. 2008) ("Generally, no waiver provisions give a contracting party some assurance that its failure to require the other party's strict adherence to a contract term will not result in a complete and unintended loss of its contract rights if it later decides that strict performance is desirable." (alterations and internal quotation marks omitted) (quoting *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *27 (Del. Ch. Apr. 2, 2007))); *Viking Pump*,

do not prohibit the Court's consideration of subsequent promises, communications, or modifications to the express agreement.[188]

Section 11.11 of the Operating Agreement includes a standard integration clause:

> Entire Agreement. This Agreement and the schedules and exhibits hereto, if any, contain all of the understandings and agreements of whatsoever kind and nature existing between the Members with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings with respect thereto.[189]

---

2007 WL 1207107, at *27 ("Non-waiver clauses serve an important purpose in contract law, which is generally to ensure that a party to a contract is given an opportunity to make a thoughtful and informed decision about whether or not to enforce a particular contract right. They give a contracting party some assurance that its failure to require the other party's strict adherence to a contract term during the hectic course of day-to-day business will not result in a complete and unintended loss of its contract rights if it later decides that strict performance is desirable."); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006) (stating integration clauses "minimize[] the risk of erroneous litigation outcomes by reducing doubts about what was promised and said, especially because the contracting parties have defined that in writing in their contract").

[188] *See Pepsi-Cola*, 297 A.2d at 33 (considering the parties' post-contract behavior and concluded it modified the written agreement, notwithstanding anti-waiver language); *Good v. Moyer*, 2012 WL 4857367, at *5 (Del. Super. Ct. Oct. 10, 2012) ("[T]he integration clause itself does nothing to prevent the Court's consideration of subsequent promises, communications, or modifications to the express agreement."). Binding precedent has recently cited both *Pepsi-Cola* and *Good. See, e.g.*, *AeroGlobal*, 871 A.2d at 444; *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2021 WL 2588905, at *12 (Del. Ch. June 14, 2021); *Weik, Nitsche & Dougherty, LLC v. Pratcher*, 2020 WL 5036096, at *4 (Del. Ch. Aug. 26, 2020); *Walsh v. White House Post Prods., LLC*, 2020 WL 1492543, at *8 (Del. Ch. Mar. 25, 2020); *Peco Logistics, LLC v. Walnut Inv. P'rs, L.P.*, 2015 WL 9488249, at *7 (Del. Ch. Dec. 30, 2015).

[189] Op. Agr. § 11.11.

Mintvest contends that "CLT's arguments rely on a characterization of capital provided prior to the [Operating] Agreement, dated November 21, 2016, as reducing the Sharing Ratios," and that "[t]his violates the Integration Provision."[190]

While integration clauses proscribe the Court's consideration of all oral and written communications and agreements that occurred prior to the agreement when interpreting it, they do nothing to prevent the Court's consideration of subsequent promises, communications, or modifications to the express agreement and therefore do not bar a finding of waiver, estoppel, or acquiescence.[191]

Here, the Operating Agreement's integration provision does not foreclose the Court from considering the emails and documents CLT relies on to reinforce that Mintvest agreed to dilution. Mintvest misconstrues CLT's argument and reliance on "various emails from August and October of 2016"[192] and "characterization of capital provided prior to the LLC Agreement" to support the conclusion that "by year-end 2016, Leary's equity interest had been diluted to approximately 5.5%."[193] CLT does not use the information reflected in those documents in a manner that is

---

[190] D.I. 283 at 22; *see also* D.I. 278 at 25–26.

[191] *See Good*, 2012 WL 4857367, at *5.

[192] D.I. 278 at 25.

[193] D.I. 283 at 22.

"contrary" to the Operating Agreement's terms, as Mintvest argues.[194]  Nor does CLT invoke those documents to color or interpret the Operating Agreement.

Instead, CLT points out that those pre-execution communications evidence Leary's understanding that while Mintvest would initially be Coinmint's 50% member, Mintvest would be diluted over time if it failed to match CLT's capital contributions.  CLT's use of those documents therefore corroborates the Operating Agreement's function, which CLT does not dispute.  And as to those documents that premise Mintvest's dilution, at least in part, on CLT's pre-November 2016 cash infusions, CLT relies on them as evidence of waiver.  After executing the Operating Agreement, Leary agreed Soniat's infusions between August 31, 2016 and December 31, 2016 should be characterized as capital contributions diluting Mintvest's stake.[195]  The integration provision does not bar the Court from considering such post-Operating Agreement documents.[196]

---

[194] D.I. 278 at 26.

[195] *See* JX 15.

[196] *See Good*, 2012 WL 4857367, at *5–6 ("To the extent that any of Moyer's alleged representations that EPX was funding the purchase price, or that Moyer was signing as purchaser solely as a convenience to EPX occurred ***prior to*** the written agreement's effectuation, the integration clause bars their consideration.  However, to the extent any representations occurred ***after*** the contract's effectuation, the representations may be considered." (footnotes omitted) (emphasis in original)).

Turning to Section 11.13's anti-waiver provision, it reads:

> No Waiver.  No waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a waiver of any other breach or default under this Agreement. Failure on the part of any Member to complain of any act or omission of any other Member, or to declare such other Member in default irrespective of how long such failure continues, shall not constitute a waiver hereunder.  No notice to or demand on a defaulting Member shall entitle such defaulting Member to any other or further notice or demand in similar or other circumstances.[197]

Mintvest maintains that the anti-waiver provision "specifically agrees that, regardless of any past failure to compl[ain] about violations of Section 3.2, Mintvest has a contractual entitlement to resist adjustments to the Sharing Ratios before this Court,"[198] and that "the second sentence of the No Waiver Provision legally bars CLT's equitable doctrines."[199]  By Mintvest's reading, the anti-waiver provision precludes future waivers and allows Mintvest to require strict performance of past defaults.[200]

Mintvest overestimates Section 11.13's scope.  The provision's first sentence operates prospectively:  "No waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of

---

[197] Op. Agr. § 11.13.

[198] D.I. 283 at 12.

[199] D.I. 278 at 23 (alteration and internal quotation marks omitted) (quoting PTO ¶ 49).

[200] *See Rehoboth Mall*, 953 A.2d at 704–05.

its obligations hereunder shall be deemed or construed to be a waiver of any other breach or default under this Agreement."[201] This sentence addresses the effect of a past waiver on subsequent waivers; it does not preclude those past waivers.

Mintvest also misreads the provision's second sentence. It mandates that "[f]ailure on the part of any Member to complain of any act or omission of any other Member, or to declare such other Member in default irrespective of how long such failure continues, shall not constitute a waiver hereunder."[202] This sentence is inapplicable to the facts presented here. Leary did not sit idly by and "fail[] to complain" about the parties' noncompliance with the Operating Agreement's terms. To the contrary, he was an active participant in shirking those terms and spearheaded the intra-Company campaign for capital contributions without formalities. And he negotiated for Mintvest's 18.2% interest and repeatedly confirmed his satisfaction with it. Based on those assurances, Soniat proceeded with the understanding that Mintvest's equity would be pegged and his future contributions would be categorized as loans. Leary's active assurances waived the Operating Agreement's dilution protocols, which is not precluded by Section 11.13's limited prohibitions.[203]

---

[201] Op. Agr. § 11.13.

[202] *Id.*

[203] *Good*, 2012 WL 4857367, at *5–6 ("Despite paragraph 9.9's provision proscribing oral modifications, Plaintiff's assertion that EPX subsequently modified the written agreement by providing part performance is sufficient conceivably to demonstrate a modification based on conduct. Furthermore, if Defendant Moyer provided subsequent assurances that EPX would fund the purchase price or that his purchaser status was merely a convenience

50

And, even if Section 11.13 had the broad scope Mintvest presses, "the law is clear that non-waiver clauses are not iron-clad protections that preclude courts from holding [a party] responsible for their post-contracting behavior," and therefore Section 11.13 does not "have the unfettered power in all circumstances to supersede the doctrines of waiver and estoppel."[204] This is best illustrated by the Delaware Supreme Court's decision in *Pepsi-Cola Bottling Co. of Asbury Park v.*

---

to EPX, those subsequent assurances could similarly modify the written agreement. As it is entirely conceivable at this posture that EPX's conduct waived or modified contract provisions, Defendant's Motion to Dismiss Count II of the Complaint is DENIED." (footnote omitted)).

[204] *Viking Pump*, 2007 WL 1207107, at *28 (quoting *Tiedke v. Fid. & Cas. Co. of N.Y.*, 222 So.2d 206, 210 (Fla. 1969)); *see also Good*, 2012 WL 4857367, at *5 ("A non-waiver clause in a contract may itself be waived through knowledge, coupled with silence and conduct inconsistent with the terms of the contract." (quoting *Mergenthaler v. Hollingsworth Oil Co.*, 1995 WL 108883, at *2 (Del. Super. Feb. 22, 1995))); 46 C.J.S. *Insurance* § 1230 ("A nonwaiver agreement, whether contained in the policy or existing separately, may be waived itself by express agreement or by acts or conduct."); 13 *Williston on Contracts* § 39:36 (4th ed.) ("The general view is that a party to a written contract can waive a provision of that contract by conduct despite the existence of a so-called antiwaiver or failure to enforce clause in the contract. . . . This general rule, that a party to a written contract may waive a provision despite the existence of an antiwaiver or failure to enforce clause, is based on the view that the nonwaiver provision itself, like any other term in the contract, is subject to waiver by agreement or conduct during performance. Some courts also support this general rule on principles of freedom to contract."); *id.* § 39:26 ("It is well settled that a party to a written contract may orally, or by implication from conduct, waive performance of a contract term or condition inserted in the contract for its benefit and that the waiver does not require a writing."); 3A *Corbin on Contracts* § 763, at 531 ("An express provision in a written contract that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary. In like manner, a provision that an express condition or a promise or promises in the contract cannot be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective. The promisor still has the power to waive the condition . . . .").

*Pepsico, Inc.*[205] There, the Court analyzed conduct-based modifications and waivers against the backdrop of contractual clauses prohibiting modification. The Court concluded that those clauses did not prohibit modification or waiver of the agreement's written terms:

> [A] written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement. . . . [A] written agreement does not necessarily govern all conduct between contracting parties until it is renounced in so many words. The reason for this is that the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit. They may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement. We think the existence of [a joint integration and no-oral modification clause] does not prohibit the modification of making of a new agreement by conduct of the parties, despite a prohibition [] against any change except by written bilateral agreement.[206]

The Court stressed that these blanket principles applied no matter the analytical vehicle; whether couched in terms of waiver, acquiescence, or other fact-specific inquiry, the outcome would be the same.[207] Section 11.13 cannot preclude CLT's defenses of waiver, estoppel, and acquiescence.

---

[205] 297 A.2d 28, 33 (Del. 1972).

[206] *Id.*

[207] *Id.* at 33–34.

## 2. The Conversion Was Valid, And Coinmint Is A Puerto Rican Entity.

Mintvest challenges the Conversion on the basis that it "took place with neither the formal vote nor written consent of Mintvest, as a Member and 50% owner of Coinmint, nor Leary as Mintvest's designee."[208]  But Mintvest was diluted to an 18.2% Member, such that CLT's majority consent and correlating majority Manager vote could have effectuated the Conversion even over Mintvest's formal objection.[209]  Accordingly, the Conversion is a voidable act, and the same equitable principles that foreclose Mintvest from contesting its dilution also foreclose it from challenging the Conversion on the basis that it was not conducted in accordance with the Operating Agreement's procedural requirements.

### a. The Conversion Is Voidable And Can Be Cured In Equity.

"The first step when analyzing a case involving the internal affairs of an LLC is . . . to examine the LLC agreement to determine whether it addresses the issue."[210] If the agreement covers the issue, the agreement controls unless it violates one of the

---

[208] D.I. 278 at 33.

[209] Section 4.5's prohibition on CLT acting individually on behalf of the Company would arguably render a unilateral and procedurally noncompliant conversion by CLT void as exceeding CLT's authority.  Because the procedurally noncompliant Conversion was done with Leary's participation, I need not reach this issue.

[210] *Godden v. Franco*, 2018 WL 3998431, at *7 (Del. Ch. Aug. 21, 2018).

Act's mandatory provisions.[211]  If the agreement is silent, then the Court must look to the Act to see if one of its default provisions apply.[212]  If neither the agreement nor the Act addresses the matter, "the rules of law and equity shall govern."[213]

Coinmint's Operating Agreement does not specify a manner of authorizing a conversion, so I turn to the Act.[214]  Section 18-216 of the Act governs conversion of a Delaware limited liability company.  Section 18-216(b) supplies a default rule that is subject to contractual variation, not a mandatory rule.[215]  It provides:

> If the limited liability company agreement specifies the manner of authorizing a conversion of the limited liability company, the conversion shall be authorized as specified in the limited liability company agreement.  *If the limited liability company agreement does not specify the manner of authorizing a conversion of the limited liability company and does not prohibit a conversion of the limited liability company*, the conversion shall be authorized in the same manner as is specified in the limited liability company agreement for authorizing a merger or consolidation that involves the limited liability company as a constituent party to the merger or consolidation.[216]

Section 18-216's default rule, which defers to the operating agreement, "arise[s]" from "deference to the principle of freedom of contract, recognition of the novelty of the conversion concept at the time of its introduction into the [] Act, due regard

---

[211] *See id.*

[212] *See id.*

[213] *Id.* (alteration omitted) (quoting 6 *Del. C.* § 18-1104).

[214] *See generally* Op. Agr.

[215] *See* Symonds & O'Toole, *supra* note 137, § 4.07, at 4-51 to 4-52.

[216] 6 *Del. C.* § 18-216(b) (emphasis added).

for the significant consequences of such a transaction, and acknowledgement of the similar results that may arise from conversion, on the one hand, and merger and consolidation transactions, on the other."[217] Further, "[i]t is theoretically possible, under the limited liability company agreement or the [] Act's applicable default rule, that the members (and/or other having voting rights) would approve the conversion of a Delaware limited liability company without reference to any specific terms."[218] "The statute does not mandate that the company's conversion must be implemented pursuant to an agreement," and "[t]he omission of such a directive, and the concurrent absence of any statutory requirements . . . provide flexibility."[219]

Here, the parties availed themselves of Section 18-216's flexibility by subjecting conversion to the Operating Agreement's merger provisions. The Operating Agreement's relevant terms require two steps: majority Member consent under Section 4.6, followed by formal Board approval via meeting or written consent, under Sections 4.3(f) and 4.4. It is undisputed that the Managers did not approve the Conversion at a board meeting or secure written consents. But in view of CLT's majority stake and the interplay of Sections 4.3(f), 4.4, and 4.6, that failure renders the Conversion voidable under the Operating Agreement, rather than void.

---

[217] Symonds & O'Toole, *supra* note 137, § 14.05[B][3], at 14-46.

[218] *Id.*

[219] *Id.* at 14-46 to 14-47.

Section 4.6 conditions the Board's power to effectuate a conversion on the consent of a "Majority of Members" who "in the aggregate, own more than fifty percent (50%) of the Sharing Ratios owned by all of the Members:"[220]

> Notwithstanding anything to the contrary contained in this Agreement, without the consent of Majority of Members, neither the Board nor any Manager or Officer shall have the power or authority . . . . [t]o effect a merger or plan of exchange of the Company . . . .[221]

Failure to obtain that majority consent strips the Board and any Manager of its power to effectuate a merger, or, in this case, the Conversion.[222] If a conversion were completed without the consent of the Majority of Members, then it would be void *ab initio*, not voidable.

Indeed, Mintvest's basis for voiding the Conversion is its unfounded position that it owned 50% of the Company in January 2018, and that CLT effectuated the Conversion without Leary's consent. But as stated, Mintvest was diluted to 18.2%, and CLT held 81.8%. CLT alone "own[ed] more than fifty percent (50%) of the Sharing Ratios owned by all of the Members,"[223] so CLT alone could give consent of the "Majority of Members." CLT did so. As a result, the Board retained the power to authorize the Conversion.

---

[220] Op. Agr. § 1(mm).

[221] *Id.* § 4.6(c).

[222] *Id.*

[223] *Id.* § 1(mm).

56

With majority Member consent, conversion must then follow Section 4.4, which provides that "all actions of the Board provided for here in shall be taken either at a meeting and evidenced by written minutes thereof . . . or by written consent without a meeting."[224] And actions taken at a meeting or by written consent must comply with Section 4.3(f), which provides that "any Board action shall require the approval of a Majority of the Managers then serving on the Board,"[225] as keyed to the appointing Member's Sharing Ratio.[226] Sections 4.3(f) and 4.4 do not include voiding language.[227] If a conversion is challenged because the Board did not formally authorize it under Sections 4.3(f) and 4.4, that failure is voidable and subject to equitable defenses. CLT and Mintvest's failure to comply with Section 4.3 and 4.4's formalities on Coinmint's behalf is ratifiable because the Company could lawfully accomplish it "if it d[id] so in the appropriate manner."[228]

---

[224] Op. Agr. § 4.4.

[225] *Id.* § 4.3(f).

[226] *See id.* § 4.3(e).

[227] *Compare id.* § 4.3(f), *and id.* § 4.4, *with id.* § 4.6.

[228] *Nevins*, 885 A.2d at 245.

### b. Mintvest Is Equitably Barred From Challenging The Conversion.

Mintvest's challenge to the Conversion as improperly authorized under Sections 4.3(f) and 4.4 is barred by the same equitable defenses that foreclosed its claim to 50% of Mintvest.

Despite Mintvest's claim that CLT caused the Conversion without Leary's knowledge, the record shows Leary was intimately involved in pursuing redomestication in Puerto Rico and invoked that decision in several Company initiatives. Between 2017 and 2019, Leary championed the redomestication effort, and helped kick off that plan by contacting attorneys in Puerto Rico to seek tax services on the Company's behalf and completing the Company's Puerto Rican tax applications.[229] When the Conversion occurred in January 2018, Leary was aware of it and requested that the related documents be forwarded to Coinmint's Puerto Rican counsel.[230]

Nothing in the record indicates that Leary objected to the Conversion as it was taking place or after.[231] To the contrary, after the Conversion was complete, Leary received multiple communications discussing "Coinmint's Re-Domestication to

---

[229] *See* JX 20.

[230] *See* JX 73.

[231] *See* Schneider Tr. 412–14; Leary Tr. 192–93.

Puerto Rico"[232] and did not contest such statements or object to the Conversion on the basis that it was completed without Mintvest's vote or written consent under the Operating Agreement.[233]  Indeed, throughout 2019, Leary leveraged the Conversion in his own initiative to launch a public offering of bitcoin tokens.  The offering memorandum that Leary spearheaded expressly stated, under the heading "Corporate Structure & Ownership" that "Coinmint, LLC was formed as a Delaware limited liability company in 2016 and reorganized as a Puerto Rico limited liability company in early 2018."[234]  And in July 2019, Leary caused Coinmint to file a Form D with the Securities and Exchange Commission in connection with a proposed exempt offering of securities.[235]  That document, signed by Leary as the President of Coinmint, LLC, prominently stated that the "Jurisdiction of Incorporation/Organization of Coinmint, LLC" is "PUERTO RICO."[236]

Thus, as with Mintvest's dilution, the record reflects that Leary participated in the Conversion and did not object to it on Mintvest's behalf until filing this action. Leary was aware of the Operating Agreement's terms and knew they required the Conversion to be effectuated by Board vote or written consent.  Nonetheless,

---

[232] *E.g.*, JX 59 at 9.

[233] *See* JX 53; JX 56; JX 57; JX 60; JX 73; JX 303; JX 304.

[234] JX 60 at 20.

[235] JX 97; Leary Tr. 173.

[236] JX 97.

consistent with his inclination to avoid formalities and focus on the task at hand, he did not object when the Conversion came and went without formal Board action and approval. Instead, he confirmed it on multiple occasions, thereby waiving the Operating Agreement's Board vote and consent requirements.[237] And so, Mintvest had "full knowledge of [its] rights and the material facts," "freely d[id] what amounts to recognition of the complained of act," remained "inactive for a considerable time," and instead "act[ed] in a manner inconsistent with the subsequent repudiation, which le[d] [CLT] to believe the act has been approved."[238] Accordingly, Mintvest is equitably barred from challenging the Conversion.

* * * * *

Because Mintvest waived Section 3.2's requirements, acquiesced in its dilution, and is estopped from asserting otherwise, I conclude that CLT's cash infusions were dilutive capital contributions, and that Mintvest's Sharing Ratio was pegged at 18.2% as of October 2017. With its voting power diluted, Mintvest also acquiesced to and is estopped from challenging the Conversion, which Mintvest participated in and CLT effectuated with its majority voting power, albeit without approving it by holding a formal vote or acting by written consent. Judgment is entered in CLT's favor on Count I.

---

[237] *See, e.g.*, *AeroGlobal*, 871 A.2d at 444–45.

[238] *Klaassen*, 2013 WL 539680, at *20 (quoting *NTC Gp., Inc.*, 1990 WL 143842, at *5).

## B. Coinmint Became A Puerto Rican Entity In January 2018, And Therefore This Court Lacks Jurisdiction Over Counts II And III.

Mintvest also challenges CLT's post-Conversion actions to (i) amend the Operating Agreement to provide that "[a] majority of the members shall determine the composition of the Board," and that "[a]ny Manager may be removed from the Board with or without cause by a Majority Vote of the Members";[239] (ii) remove Leary from the Board under those amended terms;[240] and (iii) designate CLT as Coinmint's sole Manager.[241] Count II of the Amended Complaint asks this Court to undo CLT's actions and declare that CLT improperly removed Leary as Coinmint's Manager. And in view of Leary's purported improper removal and the parties' insurmountable differences, Count III requests that this Court dissolve Coinmint, either equitably or statutorily under Section 18-802 of the Act.

But in view of my conclusion that Coinmint was properly converted to a Puerto Rican entity in 2018, I am compelled to consider whether this Court has subject matter jurisdiction to adjudicate Counts II and III, which address the internal affairs of a Puerto Rican entity. CLT raised this issue during the pleading stage, but I was compelled to accept the Amended Complaint's allegations as true and allow

---

[239] JX 109 at COINMINT_157545; *see* JX 108 at COINMINT_157544; JX 110 at 1.

[240] JX 108 at COINMINT_157544; PTO ¶ 31.

[241] JX 110 at 1; PTO ¶ 31.

Mintvest's claims to proceed. Now, with the benefit of the record demonstrating Mintvest was diluted to a minority position and Coinmint was validly converted, CLT's early jurisdictional concerns under Rule 12(b)(1) are given new life. "[I]n the absence of subject matter jurisdiction, a decision in this proceeding would be a nullity."[242] This Court must decide the jurisdictional question.[243]

"The Court of Chancery is proudly a court of limited jurisdiction."[244] Therefore, the Court has a duty to determine whether it has subject matter jurisdiction over a plaintiff's claims and can raise the issue *sua sponte*.[245] Indeed, "[t]he issue of subject matter jurisdiction is so crucial that it may be raised at any time before final judgment."[246] "The Court of Chancery can exercise subject matter

---

[242] *Bruno v. W. Pac. R. Co.*, 498 A.2d 171, 172 (Del. Ch. 1985), *aff'd*, 508 A.2d 72 (Del. 1986).

[243] *See id.*

[244] *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *4 (Del. Ch. June 27, 2019).

[245] *See, e.g.*, Ct. Ch. R. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the Court lacks jurisdiction of the subject matter, the Court shall dismiss the action."); *Envo, Inc. v. Walters*, 2009 WL 5173807, at *4 n.10 (Del. Ch. Dec. 30, 2009) ("The issue of subject matter jurisdiction is so crucial that it may be raised . . . by the court *sua sponte*."), *aff'd*, 2013 WL 1283533 (Del. Mar. 28, 2013) (TABLE); *Int'l Bus. Machs. Corp. v. Comdisco, Inc.*, 602 A.2d 74, 77 n.5 (Del. Ch. 1991) ("[U]nlike many jurisdictions, judges in the Delaware Court of Chancery are obligated to decide whether a matter comes within the equitable jurisdiction of this Court regardless of whether the issue has been raised by the parties.").

[246] *Envo*, 2009 WL 5173807, at *4 n.10.

jurisdiction only when a case falls into one of three buckets," including cases in which "a plaintiff states an equitable claim" or "jurisdiction exists by statute."[247] Whenever it appears by suggestion of the parties or otherwise that the action does not fall within one of these categories, "the Court shall dismiss the action."[248]

Here, Mintvest asserts statutory subject matter jurisdiction over Count I under Section 18-111 of the Act; over Count II under Section 18-802 of the Act; and Count III under Section 18-110 of the Act. Under the plain language of the Act and general principles that this Court has applied when considering foreign Courts' authority over Delaware entities, I conclude this Court has statutory authority to hear Count I, regarding the pre-Conversion dilution and the propriety of the Conversion. The conclusion that Coinmint was converted into a Puerto Rican LLC obviates jurisdiction over Counts II and III.

### 1. This Court Has Jurisdiction Over Count I Under Section 18-111 Of The Act.

The Act carefully distinguishes between Delaware and non-Delaware limited liability companies. Its references to "limited liability company" and "domestic limited liability company" mean "a limited liability company formed under the laws

---

[247] *Delawareans for Educ. Opportunity v. Carney*, 2018 WL 4849935, at *5 (Del. Ch. Oct. 5, 2018); *see also Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004) (identifying the three ways the "Court of Chancery can acquire subject matter jurisdiction").

[248] Ct. Ch. R. 12(h)(3).

of the State of Delaware,"[249] so references to a "limited liability company agreement" refer to the operating agreement of a Delaware entity.[250]

Section 18-216 contemplates that "a domestic limited liability company may convert to . . . a foreign limited liability company."[251] Upon conversion to a foreign limited liability company, "the limited liability company shall cease to exist as a limited liability company of the State of Delaware."[252] Consistent with this logic, the Act treats non-Delaware entities as separate creatures from Delaware LLCs:

> "Foreign limited liability company" means a limited liability company formed under the laws of any state or under the laws of any foreign country or other foreign jurisdiction. When used in this title in reference to a foreign limited liability company, the terms "limited liability company agreement," "limited liability company interest," "manager" or "member" shall mean a limited liability company agreement, limited liability company interest, manager or member, respectively, under the laws of the state or foreign country or other foreign jurisdiction under which the foreign limited liability company is formed.[253]

---

[249] 6 *Del. C.* § 18-101(8).

[250] *Id.* § 18-101(9).

[251] *Id.* § 18-216(a).

[252] *Id.* § 18-216(f). When a domestic limited liability company converts to a foreign entity, under Section 18-216, the entity agrees it may be served with process in the State of Delaware for "any action, suit or proceeding for enforcement of any obligation of the limited liability company arising while it was a limited liability company of the State of Delaware." *Id.* § 18-216(e)(6).

[253] *Id.* § 18-101(6); *see also* 2 Larry E. Ribstein & Robert R. Keatinge, *Ribstein and Keatinge on Limited Liability Companies*, § 16:3 (discussing potential ways to resolve the "uncertainty" between domestic and foreign limited liability companies, and stating that "second approach is to attempt more explicitly to define 'foreign limited liability company'" in legislation).

Under Subchapter IX of the Act, "[s]ubject to the Constitution of the State of Delaware," "[t]he laws of the state, territory, possession, or other jurisdiction or country under which a foreign limited liability company is organized govern its organization and internal affairs and the liability of its members and managers."[254] But conversion does not "affect any obligations or liabilities of the limited liability company incurred prior to such conversion or the personal liability of any person incurred prior to such conversion, nor shall it be deemed to affect the choice of law applicable to the limited liability company with respect to matters arising prior to such conversion."[255]

For domestic LLCs, Section 18-111 gives the Court of Chancery jurisdiction to hear "[a]ny action to interpret, apply or enforce the provisions of a limited liability company agreement . . . or any provision of this chapter, or any other instrument, document, agreement or certificate contemplated by any provision of this chapter."[256] I conclude that section grants this Court jurisdiction to construe the Company's Operating Agreement that governed while it was domiciled in Delaware. In view of Section 18-216(g), I see no basis in the Act to conclude that conversion

---

[254] 6 *Del. C.* § 18-901(a)(1); *see also* Ribstein & Keatinge, *supra* note 253, § 16:3 ("Most LLC statutes provide that the law of a formation jurisdiction governs the organization, internal affairs, and member liability of a foreign LLC.").

[255] 6 *Del. C.* § 18-216(g).

[256] *Id.* § 18-111.

divested this Court of that jurisdiction. Section 18-111 confers subject matter jurisdiction over Count I, as it requires this Court to adjudicate the Operating Agreement's construction and the parties' performance under it before the Company converted.[257]

### 2. The Plain Language Of Sections 18-110 And 18-802 Foreclose This Court From Adjudicating Counts II and III Under The Act.

Mintvest presses that this Court has the power to adjudicate Counts II and III because "[r]egardless of Coinmint's domicile, the LLC Agreement provides that Delaware law controls."[258] "There is, of course, a distinction between choice of law questions and questions of personal jurisdiction, and it is the case that a choice of law provision, without more, will not create a sufficient contact to support personal jurisdiction in the state whose law is chosen to govern the relationship."[259] "Parties may agree to submit their persons to the jurisdiction of any given court but may not confer subject matter jurisdiction which is otherwise absent."[260] And Delaware

---

[257] *See id.*

[258] D.I. 278 at 37; *see* Op. Agr. § 11.4 ("This Agreement and the application and interpretation hereof, shall be governed exclusively by the laws of the State of Delaware, specifically the Act.").

[259] *E.g.*, *In re USACafes, L.P. Litig.*, 600 A.2d 43, 51 (Del. Ch. 1991).

[260] *Chrysler Cap. Corp. v. Suresky*, 1987 WL 10531, at *1 (Del. Super. Ct. Apr. 29, 1987); *accord Butler v. Grant*, 714 A.2d 747, 749–50 (Del. 1998) ("It is, however, well-established Delaware law that parties cannot confer subject matter jurisdiction upon a court."); *Seokoh, Inc.*, 2021 WL 1197593, at *9 ("Although the Court generally will respect the parties' choice of forum, the parties cannot contract for jurisdiction where it otherwise is unavailable." (quoting *Sun Life Assurance Co. of Can. – U.S. Operations Hldgs., Inc. v.*

recognizes that I must determine whether this Court has subject matter jurisdiction over Counts II and III under Sections 18-110 and 18-802 of the Act, notwithstanding the Operating Agreement's choice of law provision.

Delaware has not directly answered the question of whether this Court may statutorily dissolve, or declare the proper managers of, a foreign limited liability company, even one that was previously a Delaware entity. My reading of the plain language of the Act compels the conclusion that this Court has no such power. As explained, the Act explicitly distinguishes between domestic and foreign limited liability companies. By their terms, both Section 18-110 and 18-802 apply only to "limited liability compan[ies]," defined under the Act as Delaware LLCs.[261] They cannot be invoked to confer upon this Court power over a Puerto Rican entity.[262] Neither Section grants jurisdiction over Counts II or III.

And "Delaware Courts will not exercise subject matter jurisdiction over a dispute that is predicated on foreign law where the foreign state has vested

---

*Gp. One Thousand One, LLC*, 206 A.3d 261, 263 (Del. Super. 2019))); *Bruno*, 498 A.2d at 172 (stating that "[t]he parties to an action may not confer subject matter jurisdiction by agreement," nor can the Court "acquire jurisdiction by estoppel").

[261] *See* 6 *Del. C.* §§ 18-110(a), 18-802.

[262] *Cf. In re Carlisle Etcetera LLC*, 114 A.3d 592, 597 (Del. Ch. 2015) ("Section 18-802 of the LLC Act addresses dissolution. . . . By its terms, this language limits the right to seek statutory dissolution under Section 18-802 to members and managers of an LLC.").

jurisdiction exclusively in its own courts."[263]  The territory of Puerto Rico appears to have vested jurisdiction over the judicial dissolution of a Puerto Rican LLC, and contested matters relating to managers as well, in its Court of First Instance.[264] Under established Supreme Court precedent, this Court lacks subject matter jurisdiction to afford relief that Puerto Rico has vested in its own court.

[263] *Candlewood Timber Gp.*, 859 A.2d at 1004; *accord Taylor v. LSI Logic Corp.*, 715 A.2d 837 (Del. 1998) (holding the Court of Chancery lacked subject matter jurisdiction to adjudicate a dispute under a Canadian statute because the "exclusive equitable remedy under Section 241 of the Canada Business Corporations Act for oppressive corporate acts lies in the courts of Canada as defined in Section 2 of the Canadian Act"), *overruled on other grounds by Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102 (Del. 2014) ("To the extent that prior cases like *Taylor v. LSI Logic Corp.* . . . have indicated that such defendants must have a prior action pending in another jurisdiction in order to invoke principles of comity for our Courts to consider their interest in receiving an authoritative ruling from the court whose law is at issue, they are overruled."); *see Ison v. E.I. DuPont de Nemours & Co., Inc.*, 729 A.2d 832, 838, n.14 (Del. 1999) (stating that in *Taylor v. LSI Logic Corp.*, "[t]his Court affirmed the dismissal . . . finding that the Canadian law at issue actually required *adjudication* in a Canadian Court, leaving the Court of Chancery with no subject matter jurisdiction" (emphasis in original)).

[264] *See* 14 L.P.R.A. § 3998 ("On application by a member or manager the Court of First Instance may decree dissolution of an LLC whenever it is not reasonably practicable to carry on the business in conformity with an LLCA."); *id.* § 3960(a) ("Upon application of any member or manager, the Court of First Instance may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company . . . ."); *id.* § 3960(b) ("Upon application of any member or manager, the Court of First Instance may hear and determine the result of any vote of members or managers upon matters as to which the members or managers of the limited liability company, or any class or group of members or managers, have the right to vote pursuant to the limited liability company agreement . . . ."); *see* D.R.E. 202(a)(1) ("Every court in this State may take judicial notice of the common law, case law and statutes of the United States and every state, territory and jurisdiction of the United States.").

### 3. Well-Established Principles Support This Court's Lack Of Subject Matter Jurisdiction Over Equitable Dissolution Of A Foreign Entity.

Mintvest also asks this Court for equitable dissolution of Coinmint, and asserts this Court needs no statutory jurisdictional grant to dissolve it as a Puerto Rican entity. Mintvest is correct that for Delaware entities, equitable dissolution is available even where statutory dissolution is not.[265] But as explained in *In re Carlisle Etcetera LLC*, this Court's power to effectuate an equitable dissolution is sourced in the State of Delaware's "interest in having the Court of Chancery available, when equity demands, to hear a petition to dissolve a [Delaware] LLC."[266] Where the entity is not a Delaware entity, I believe the principles delineating a sovereign's interest in its native entities compel the conclusion that this Court lacks

---

[265] *Carlisle*, 114 A.3d at 605 ("This court has held that the parties to an LLC agreement can waive by contract the right to seek statutory dissolution under Section 18–802. In my view, the ability to waive dissolution under Section 18–802 does not extend to a party's standing to seek dissolution in equity." (citations omitted)); *see, e.g.*, *In re Interstate Gen. Media Hldgs., LLC*, 2014 WL 1697030, at *8 (Del. Ch. Apr. 25, 2014) ("It is well-settled under Delaware law that LLCs are creatures of contract rather than statute, and that those who form LLCs are given great latitude in defining their rights and obligations by mutual agreement. Based on that freedom, the parties to the LLC Agreement were free to craft whatever procedure they wished to govern [the company]'s dissolution. That freedom included the ability to proscribe the use of judicial dissolution altogether as a means to dissolve the Company.").

[266] 114 A.3d at 606 (citing *In re Revlon, Inc. S'holders Litig.*, 990 A.2d 940, 960 n.8 (Del. Ch. 2010) (noting possibility of including a forum selection clause in an entity's constitutive agreement, but envisioning that "the Delaware courts would retain some measure of inherent residual authority so that entities created under the authority of Delaware law could not wholly exempt themselves from Delaware oversight")).

subject matter jurisdiction to equitably dissolve that entity. Delaware has guarded its jurisdiction over the internal affairs of Delaware entities, and other courts have declined to dissolve Delaware entities. Applying these principles together, I conclude this Court cannot dissolve foreign entities.

Actions to dissolve an entity implicate the internal affairs doctrine and the interest of the sovereign.[267] "The internal affairs doctrine requires that the law of the state of incorporation should determine issues relating to internal corporate affairs."[268]

---

[267] *See Terramar Retail Ctrs. LLC v. Marion #2-Seaport Tr. U/A/D/ June 21, 2002*, 2017 WL 3575712, at *11 (Del. Ch. Aug. 18, 2017) ("Dissolution both implicates the internal affairs of a Delaware entity and is an inherently Delaware-centric act which requires the filing of a certificate of cancellation with the Delaware Secretary of State."), *aff'd*, 184 A.3d 1290 (Del. 2018); *Carlisle*, 114 A.3d at 605–06 ("To my mind, when a sovereign makes available an entity with attributes that contracting parties cannot grant themselves by agreement, the entity is not purely contractual. Because the entity has taken advantage of benefits that the sovereign has provided, the sovereign retains an interest in that entity. That interest in turn calls for preserving the ability of the sovereign's courts to oversee and, if necessary, dissolve the entity. Put more directly, an LLC agreement is not an exclusively private contract among its members precisely because the LLC has powers that only the State of Delaware can confer.").

[268] *McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del. 1987) ("The traditional conflicts rule developed by courts has been that internal corporate relationships are governed by the laws of the forum of incorporation."); *see VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112 (Del. 2005) ("The internal affairs doctrine is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs—the state of incorporation."); *cf. Aveta Inc. v. Cavallieri*, 23 A.3d 157, 168 (Del. Ch. 2010) (stating that "[t]he implementation and effectiveness of a merger between two corporations from the same jurisdiction is an internal corporate matter to be governed by the law of that jurisdiction," and applying the internal affairs doctrine to conclude that "law of Puerto Rico governs the corporate mechanics of the merger" between two Puerto Rican corporations); *TC Invs., Corp. v. Becker*, 2010 WL 2593525, at *11

It has long been settled doctrine that a court—state or federal—sitting in one State will as a general rule, decline to interfere with, or control by injunction or otherwise the management of the internal affairs of a corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile.[269]

"[T]he authority to regulate a corporation's internal affairs should not rest with multiple jurisdictions."[270] It "is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares," as "[a] State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs."[271] As such, this Court has recognized that "Delaware has a strong interest in resolving issues concerning the internal affairs of a Delaware corporation promptly and efficiently."[272] As explained in *Carlisle*, the Delaware General Assembly amended the Act in 2013 to reassert Delaware's sovereign jurisdiction over internal affairs of Delaware entities, including specifically for

_____

(D.P.R. June 28, 2010) (following internal affairs doctrine and applying Delaware law to Delaware limited liability company).

[269] *Rogers v. Guar. Tr. Co. of N.Y.*, 288 U.S. 123, 130 (1933).

[270] *See VantagePoint Venture P'rs*, 871 A.2d at 1112–13.

[271] *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 91 (1987).

[272] *McElroy v. Schornstein*, 2012 WL 2428343, at *1 (Del. Ch. June 20, 2012).

dissolution proceedings.[273]  This Court has staked its paramount role in deciding dissolution under Section 18-802, while deferring to a foreign court's power to adjudicate and resolve preliminary or additional issues.[274]

Delaware's sister courts have declined to extend their jurisdiction to dissolve Delaware entities.  *Seokoh, Inc. v. Lard-PT, LLC* explained that under "well-settled" New York law, New York courts "lack[] jurisdiction to issue a decree of judicial dissolution for [a Delaware limited liability company]."[275]  New York does not stand

---

[273] 114 A.3d at 605 ("[T]he General Assembly in 2013 adopted an amendment to the LLC Act inconsistent with the purely contractarian view.  Of particular relevance to dissolution, the purely contractarian view discounts core attributes of the LLC that only the sovereign can authorize, such as its separate legal existence, potentially perpetual life, and limited liability for its members." (footnote omitted) (citing 6 *Del. C.* §§ 18-201, 18-303)); *see Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *10 (Del. Ch. Jan. 10, 2006) (concluding that judicial dissolution trumps an arbitration clause, finding "it impossible to conclude that Willie Gary must press a claim for dissolution before an arbitrator in the first instance, when the Agreement itself expressly refers to a 'judicial determination' of whether grounds for dissolution exist, and when the dissolution provisions of the Agreement then go on to refer to the involvement of a 'court of competent jurisdiction'"), *aff'd*, 906 A.2d 76 (Del. 2006).

[274] *See, e.g.*, *In re Data Processing Consultants, Ltd.*, 1987 WL 25360, at *5 (Del. Ch. Nov. 25, 1987); *Xpress Mgmt., Inc. v. Hot Wings Int'l, Inc.*, 2007 WL 1660741, at *5–6 (Del. Ch. May 30, 2007); *McElroy*, 2012 WL 2428343, at *1–2.

[275] 2021 WL 1197593, at *9 (citing *Raharney Cap., LLC v. Cap. Stack LLC*, 25 N.Y.S.3d 217, 217–18 (N.Y. App. Div. 2016)); *see MHS Venture Mgmt. Corp. v. Utilisave, LLC*, 881 N.Y.S.2d 452, 454 (N.Y. App. Div. 2009) ("A claim for dissolution of a foreign limited liability company is one over which the New York courts lack subject matter jurisdiction."); *Rimawi v. Atkins*, 840 N.Y.S.2d 217 (N.Y. App. Div. 2007) ("A limited liability company is a hybrid entity and is, in all respects pertinent here, most like a corporation.  Thus, unlike the derivative claim involving the internal affairs of a foreign corporation, plaintiffs' claim for dissolution and an ancillary accounting is one over which the New York courts lack subject matter jurisdiction." (citations omitted)).

alone.[276]  Courts in other jurisdictions have adopted this approach:  "Courts other

than those of the State creating it, and in which it has its habitat, have no visitorial

powers over such corporation, have no authority to remove its officers, or to punish

---

[276] *See* Restatement (First) of Conflict of Laws § 157 (stating that a corporation may only be dissolved by state of domicile); Restatement (Second) of Conflict of Laws § 300 (recognizing right of a state to forbid a foreign business entity to do business within its territory, but not to dissolve said foreign entity); 19 Am. Jur. 2d *Corporations* § 2335 ("Since a corporation is a creature of the state by which it is chartered, the right to dissolve the corporation without its consent belongs exclusively to the state.  The existence of a corporation cannot be terminated except by some act of the sovereign power by which it was created."); 19 A.L.R.3d 1279, §3[a] ("In many of the cases discussing the jurisdiction of a court, whether state or federal, to dissolve or wind up the affairs of a corporation domiciled in another state, the view has been taken that the court does not have jurisdiction over such actions.  Such decisions are evidently based in most instances on the theory that since the corporation is a creature of the state creating it, that state alone should terminate its legal existence.  In any event, see the following cases generally recognizing that a court ordinarily does not have jurisdiction of the dissolution or winding up of a foreign corporation."); 17A Fletcher Cyc. Corp. § 8579 ("Courts applying the general rule have held that any attempt of the courts in a particular state or country to dissolve a foreign corporation would be so palpably an attempt to usurp the powers of a foreign jurisdiction without color of authority as to be a nullity, even when called to the court's attention in a collateral proceeding." (footnotes omitted)); Ribstein & Keatinge, *supra* note 253, § 14:18 ("Generally speaking, only the courts of the jurisdiction under whose law the LLC was organized have the capacity to order its judicial dissolution."); Peter B. Ladig & Kyle Evans Gay, *Judicial Dissolution:  Are the Courts of the State that Brought You In the Only Courts that Can Take You Out?*, 70 BUS. LAW. 1059, 1082 (2015) (concluding persuasively that dissolution should be left to the state of formation because "the act of dissolution is essentially different than other statutory claims" because it "severs the tie between the parties and the state of formation[,]" "terminates the special powers given to the entity that only the state of formation can give[,]" and "also ends the life of the entity in not just the forum state, but in any other state"); Michael V. Caracappa, *"Exclusive" Jurisdiction in Delaware's General Corporation Law:  Why States Lack the Power to Strip Jurisdiction from Their Sister States and the Federal Courts*, 49 Seton Hall L. Rev. 1091, 1119–20 (2019) ("Today, courts other than those within the state of incorporation lack the practical power to dissolve foreign corporations, though this has not stopped some courts from attempting to fashion remedies in lieu of dissolution.  Many courts that have considered that issue accept that the internal affairs doctrine limits their ability to dissolve foreign corporations." (footnotes omitted)).

them for misconduct committed in the State which created it, nor to enforce a forfeiture of its charter."[277]  "[W]herever a corporation may go, its existence as a corporation is referable to the laws of the state of its creation," and "[c]onsequently, a foreign corporation is controlled, as to its dissolution, by the laws of its domicile."[278]

---

[277] *Valone v. Valone*, 2010 WL 7373698, at *2 (Va. Cir. Ct. Jan. 20, 2010) (quoting *Taylor v. Mut. Reserve Fund Life Assoc.*, 33 S.E. 385, 388 (Va. 1899)); *see also, e.g.*, *Lillard v. Lonergan*, 72 F.2d 865, 870 (10th Cir. 1934) ("A corporation can be dissolved and its affairs closed and its franchises seized or withdrawn only by the sovereignty that created it and in the way it provides."); *Spurlock v. Santa Fe Pac. R.R. Co.*, 694 P.2d 299, 312 (Az. Ct. App. 1984) ("[N]o court can declare a forfeiture of a franchise or a dissolution of a corporation except the courts of the jurisdiction which created it."); *Miller v. Hawkeye Gold Dredging Co. Ltd.*, 137 N.W. 507, 512 (Iowa 1912) (holding suit to wind up affairs of a corporation must be brought in the jurisdiction where the corporation was organized); *de Nunez v. Bartels*, 684 So.2d 1008, 1011 (La. Ct. App. 1996) ("The courts of one state or country have no jurisdiction or power to dissolve a corporation created by another state or country.  The fact that the foreign corporation does business or owns property in the state where the action to dissolve is brought does not give the court the power to dissolve it."); *Mills v. Anderson*, 214 N.W. 221, 223 (Mich. 1927) ("It is text-book law that the courts of one state cannot dissolve a corporation created by another state. . . . As a legal entity it could only be dissolved by the courts of that state, regardless of what business it did in other states."); *State v. Dyer*, 200 S.W.2d 813, 816 (Tex. 1947) ("One state has no power to dissolve a corporation created by the laws of another state."); *Young v. JCR Petroleum, Inc.*, 423 S.E.2d 889, 892 (W.Va. 1992) (concluding that there was no statutory power granted to West Virginia courts to dissolve a foreign corporation, and that the Full Faith and Credit Clause of the United States Constitution requires each state to respect the sovereign acts of the other states, and that the creation and dissolution of a corporation is one such act).

[278] 17A Fletcher Cyc. Corp. § 8579 ("The general rule is that neither through its legislature nor its courts can one state declare the forfeiture of the charter of a corporation of another state or country or otherwise dissolve the corporation, regardless of the amount of business done by the corporation in that state or the amount of property it may have in that state." (footnotes omitted)).

While Delaware has adopted the rule that it governs the dissolution of its own entities, it has not yet joined its sister courts in explicitly stating that it cannot dissolve foreign entities. But Delaware decisions support doing so. As early as 1886, Delaware jurists recognized the importance of deferring to the state of formation. In *Swift v. Richardson*,[279] the Delaware Superior Court considered whether it had "jurisdiction by mandamus over a foreign corporation, its officers or agents, to enforce the performance of a corporate duty not imposed by any law of this state."[280] "A careful investigation of the theory upon which corporations both public and private are created" compelled the dissent's conclusion that the Court had no such power.[281] The dissent reasoned that "[t]he power to confer corporate franchises and privileges always has been considered as vested in the sovereign authority of the state. The creation of a corporation, whether public or private, is an act of sovereignty, whereby a portion of the sovereign powers is conferred upon the corporators."[282] "It is therefore manifest, since such corporation and the state creating it are the only parties to this obligation, that the duty to fulfill it is due solely to that state, and that the right to superintend and enforce its fulfillment belongs to

---

[279] 32 A. 143, 144 (Del. Super. Ct. 1886) (Grubb, J., dissenting); *see also Swift v. State*, 6 A. 856 (1886) (issuing *Swift v. Richardson* majority opinion).

[280] *Richardson*, 32 A. at 144.

[281] *Id.*

[282] *Id.*

that particular sovereignty alone."[283] Because the Court's authority was asked to "remedy the abuse of franchises conferred by sovereignty," the dissent concluded,

> [I]t can only be issued, when invoked against a private corporation, in the name and by the authority of the state which created the corporation, and to which state is exclusively due its obligation to duly exercise its powers and functions so as to promote primarily the public good of the people of that state in fulfillment of the design which that particular sovereignty had in creating such corporation; and this is true whether the writ be invoked by the legal officer of the state, to enforce the obligation in behalf of the public generally, or sought by a stockholder of the corporation, to compel the performance of a corporate duty which may result from this obligation to the state, and so inure to his private benefit.[284]

Over seventy years later, in 1959, the Delaware Supreme Court observed a related jurisdictional boundary by concluding that once stock is converted into that of a foreign corporation by operation of a merger, Delaware no longer has jurisdiction to sequester those shares. In *Union Chemical & Materials Corp. v. Cannon*, the plaintiff filed a derivative suit against certain individual defendants.[285] To compel their appearance, the individual defendant's stock was validly seized under Delaware's sequestration statute.[286] But very shortly thereafter, the nominal defendant company merged with a New Jersey corporation, and so the individual defendants' stock automatically converted into shares of the New Jersey

---

[283] *Id.* at 147.

[284] *Id.*

[285] 148 A.2d 348, 349–50 (Del. 1959).

[286] *Id.*

corporation.[287]  The Delaware Supreme Court observed that by virtue of both the sequestration and the merger, "[t]he certificates of [the company] now constitute property subject to the jurisdiction of the courts of the several states in which they are located."[288]  The Court concluded that the merger divested the Court of Chancery of jurisdiction over the shares.[289]

Other Delaware Supreme Court decisions have stressed the importance of comity, the "recognition of the legislative, executive, or judicial acts of another nation in due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."[290] "[T]he Court is mindful of the important interest of affording comity to foreign business law governing the internal affairs of a foreign corporation."[291]  "If we

---

[287] *Id.*

[288] *Id.* at 351.

[289] *Id.* at 351–52.  This was true notwithstanding "the general principle that jurisdiction once acquired is not defeated by subsequent events, and that where jurisdiction of the person or *res* has once attached it is not defeated by the removal of the person or the *res* beyond the jurisdiction of the court."  *Id.* at 352.  As the Court observed, that principle applied "to cases involving loss of jurisdiction over the *res* but retention of personal jurisdiction," and was not applicable there.  *Id.*

[290] *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1083 (Del. 2011) (alterations and internal quotation marks omitted) (quoting *Taylor*, 715 A.2d at 842).

[291] *Id.*; *see also Ison v. E.I. DuPont de Nemours & Co.*, 729 A.2d 832, 844 (Del. 1999) (noting that "home countries have a significant interest" in setting the safety standards that apply in their own country); *Third Ave. Tr. v. MBIA Ins. Corp.*, 2009 WL 3465985, at *5 (Del. Ch. Oct. 28, 2009) ("Because of the importance of this question to New York public policy, and the absence of any legitimate interest Delaware has in the question, I believe that an appropriate regard for comity requires this court to abstain and allow the courts of

77

expect that other sovereigns will respect our state's overriding interest in the interpretation and enforcement of our entity laws, we must show reciprocal respect."[292]

In my view, Delaware's approach is consistent with the general rule advanced in other state and federal courts that only the courts of the jurisdiction under whose law the limited liability company is organized have the capacity to order its dissolution.[293] This Court's protectionist approach over its entities formed under this State's laws compels a similar respect for the interests of other sovereigns in overseeing the life and death of their entities.

Coinmint no longer exists under Delaware law, and is no longer "tak[ing] advantage of benefits that the State of Delaware provides," so Delaware no longer "retains an interest in that entity" such that it may compel dissolution.[294] I conclude

---

New York to speak on the collateral effect to be given to the determinations of the Superintendent of the New York Insurance Department."); *Diedenhofen–Lennartz v. Diedenhofen*, 931 A.2d 439, 451 (Del. Ch. 2007) ("Delaware has a related and equally important interest in affording comity to the courts of other jurisdictions when a dispute arises under foreign business law."); *Tex. Instruments Inc. v. Cyrix Corp.*, 1994 WL 96983, at *4 n.5 (Del. Ch. Mar. 22, 1994) ("A state's interest in applying its own law is a factor deserving of recognition and weight.").

[292] *Diedenhofen*, 931 A.2d at 452 ("That means giving more respect to the shared expectations of the owners and managers of a business entity that their internal affairs should governed by expert determinations made by jurists in the domicile of the entity, and much less to the desires of a plaintiff who for tactical reasons seeks to have a Delaware judge make a determination of foreign law.").

[293] *See, e.g.*, Ribstein & Keatinge, *supra* note 253, § 14:18.

[294] *Carlisle*, 114 A.3d at 605–06.

that when the Conversion was completed in 2018 and Coinmint ceased to exist as a Delaware entity, this Court was divested of its power to equitably dissolve Coinmint.

## III.   CONCLUSION

Judgment is entered in favor of CLT on Count I.   Counts II and III are dismissed for lack of subject matter jurisdiction.   The parties shall submit a final order and judgment within twenty days of this decision.